Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Tyler H.L. Tornabene
Dan Fruchter
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767


Larissa Payne
Director, Medicaid Fraud Control Division
Washington State Office of the Attorney General
James Douglas Boling
Rachel Sterett
Assistant Attorneys General
P.O. Box 10114
Olympia, WA 98504
Telephone: 360-586-8888

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA;
STATE OF WASHINGTON, *ex rel.*
DR. DEANETTE L. PALMER, PHD,
and RICHARD PALMER, as
RELATORS,

                              Plaintiffs,

        v.

MULTICARE HEALTH SYSTEM
dba MULTICARE DEACONESS
HOSPITAL and MULTICARE
ROCKWOOD CLINIC
NEUROSURGERY,

                              Defendant.

No. 2:22-cv-00068-SAB

UNITED STATES' AND STATE
OF WASHINGTON'S
COMPLAINT IN INTERVENTION

**JURY TRIAL DEMANDED**

United States' and State of Washington's Complaint in Intervention - 1

# I.    INTRODUCTION

1.    The United States of America (United States) hereby files this Complaint in Intervention alleging, among other things, that Defendant, Multicare Health System ("MultiCare" or Defendant), violated the False Claims Act, 31 U.S.C. § 3729, by knowingly causing the submission of false and fraudulent claims to Medicare, Washington Medicaid, and other federal health care programs, for neurosurgery procedures and services.

2.    The State of Washington (Washington) hereby jointly files this Complaint in Intervention alleging, among other things, that MultiCare violated the Washington State False Claims Act, RCW 74.66 by knowingly causing the submission of false and fraudulent claims to Washington Medicaid for neurosurgery procedures and services.

3.    MultiCare knowingly submitted materially false claims to federal health care programs by billing for the costs of surgical procedures performed by Dr. Jason A. Dreyer, D.O. ("Dr. Dreyer"), a neurosurgeon who, as MultiCare knew, falsified diagnoses, performed medically unnecessary procedures and over-operations, billed for services that were not medically indicated and that he did not actually perform, and performed surgical procedures below the applicable standard of care.

4.    MultiCare hired, credentialed, employed, and supervised Dr. Dreyer while ignoring and failing to take appropriate action on numerous red flags, warnings, and specific evidence of Dr. Dreyer's fraud and endangerment of the public in order to generate revenue for itself and for its officers and executives, by allowing and incentivizing Dr. Dreyer to perform a high volume of complex spinal surgeries operating on hundreds of unsuspecting patients and putting financial considerations in front of the safety and health of those patients in the Eastern District of Washington and elsewhere.

5.    As detailed herein, the red flags, warnings, and specific evidence of Dr. Dreyer's dangerous and fraudulent behavior known to MultiCare while hiring, credentialing, employing, and supervising Dr. Dreyer included:

- that Dr. Dreyer had previously been suspended and placed on extended administrative leave by, and resigned from, Providence St. Mary's Medical Center in Walla Walla, Washington, ("Providence St. Mary") based on concerns that Dr. Dreyer had over-operated, and performed medically unnecessary surgeries;

- that, while employed and credentialed at MultiCare, Dr. Dreyer was under state investigation by the Washington State Department of Health, for practicing below medical standards of care;

- that, while employed and credentialed at MultiCare, Dr. Dreyer was under federal investigation for, among other things, his fraudulent billing supported by falsified diagnoses at Providence St. Mary; and

- that multiple MultiCare medical providers with direct knowledge of Dr. Dreyer's spinal surgeries at MultiCare had internally raised concerns to MultiCare that Dr. Dreyer was conducting medically unnecessary spinal surgeries and endangering patients.

6.    MultiCare's knowing conduct resulted in the submittal of dozens, if not hundreds, of materially false and fraudulent claims for the professional services of Dr. Dreyer and related health care costs to Medicare and other federal health care programs, and the use of accompanying false records and statements that MultiCare knowingly made and used, material to those false and fraudulent claims. Through these false and fraudulent claims, MultiCare received millions of dollars in revenue, while unknowing patients were endangered and harmed.

7.    The United States and the State of Washington bring this action to hold MultiCare accountable for recklessly and knowingly placing the public, unsuspecting patients, and federal health care beneficiaries, including the elderly, disabled,

United States' and State of Washington's Complaint in Intervention - 3

veterans, active-duty and retired military servicemembers and their families, and disadvantaged members of the community, in danger in order to line its own pockets.

## II.   THE PARTIES, JURISDICTION, AND VENUE

### A.   The Parties

8.    Plaintiff, the United States of America, brings this civil enforcement action against Defendant to recover treble damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, and also under the common law.

9.    Co-Plaintiff Washington State brings this action on behalf of the State's Medicaid program pursuant to RCW 74.66 *et seq*., RCW 43.10.030, and the common law.

10.    The United States Department of Health and Human Services (HHS) is a cabinet-level executive branch department of the United States created to protect the health of the people of the United States. HHS's mission is "improving the health, safety, and well-being of America."  The United States Centers for Medicare and Medicare Services (CMS), which is part of HHS, administers the Medicare and Medicaid program on behalf of the United States.

11.    As relevant to this Complaint, the Washington State Health Care Authority (HCA) administers the Washington Apple Health program, Washington State's Medicaid program, on behalf of the State of Washington.  HCA's mission is to provide high quality health care through innovative health policies and purchasing strategies.

12.    The United States Department of Veterans Affairs (VA), through the Veterans Health Administration (VHA), provides health care services and benefits for veterans of the United States military, air, and naval service.  Like the False Claims Act, the VA and its health care program arose out of the Civil War, created, in the words of President Abraham Lincoln, "to care for him who shall have borne the battle and for his widow, and his orphan."  The VA provides direct health care services at its health facilities, which together comprise the largest health system in

United States' and State of Washington's Complaint in Intervention - 4

the United States, and provides benefits and reimbursement for services provided outside the VA when the VA cannot provide those services directly, through the VA Community Care program.

13.    The United States Department of Defense's (DoD) TRICARE program provides health care benefits for uniformed service members, retirees, and their families around the world.  TRICARE plans provide comprehensive coverage to beneficiaries, with a mission of providing "health support for the full range of military operations and sustaining the health of all those entrusted to our care."

14.    The United States Office of Personnel Management (OPM) administers the Federal Health Benefits Program, which is a health program that provides health care benefits for non-military federal employees, retirees, and their families.

15.    Defendant MultiCare is incorporated in Washington as a not-for-profit corporation and health care organization with its principal place of business in Tacoma, Washington.  MultiCare operates hospitals, clinics, and health care practices and services throughout Washington, including MultiCare Deaconess Hospital and MultiCare Rockwood Clinic, both located in Spokane, Washington, in the Eastern District of Washington.

16.    During the time period relevant to this Complaint, Relator Deannette Palmer (Relator) was a Medicare beneficiary and resident of Spokane, Washington, in the Eastern District of Washington, who was a MultiCare patient upon whom Dr. Dreyer performed surgery at MultiCare Deaconess Hospital in September 2020.  On or about April 13, 2022, Relator filed a *qui tam* Complaint alleging violations of the False Claims Act.  On August 4, 2023, the United States intervened in the action.  ECF No. 12.

B.    Jurisdiction and Venue

17.    The United States' claims arise under the False Claims Act, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact, negligence,

and unjust enrichment. The United States has authority to bring these claims pursuant to 31 U.S.C. § 3730(a).

18. The Washington Attorney General's Medicaid Fraud Control Division (MFCD) has authority to investigate and prosecute, either civilly or criminally, Medicaid providers who commit fraud, abuse or neglect. This authority is granted under RCW 43.10.030(1), RCW 43.10.230, RCW 74.67.010, RCW 74.66.040 and 42 U.S.C. § 1396b(q)(3) and (4). Washington State brings this action on behalf of the State's Medicaid program pursuant to RCW 74.66 *et seq*., RCW 43.10.030, and the common law.

19. This Court has subject matter jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345 and 1367(a) and supplemental jurisdiction over the counts relating to the State false claims statute and the State common law causes of action pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

20. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant resided and transacted business in this District during the relevant time period, and because the acts proscribed by the False Claims Act occurred in this District.

21. Venue is proper in the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because MultiCare transacts business in this District and a substantial part of the events giving rise to the claims, including numerous acts proscribed by 31 U.S.C. § 3729, occurred in this District.

### III.    LEGAL AND FACTUAL BACKGROUND

A.    The Federal False Claims Act

22. Originally enacted in the 1860s to combat rampant fraud against the Union Army during the Civil War[1], the False Claims Act, 31 U.S.C. §§ 3729-3733, is

---

[1]    *U.S. ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.*, 722 F.Supp. 607, 608 (N.D. Cal. 1989) (*quoting* 36 R. Tomes, The Fortunes of War, Harper's

the primary tool with which the United States combats false claims and fraud against the Government and protects the public fisc. The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White*, 390 U.S. 228, 232, 88 S.Ct. 959 (1968).

23.    The False Claims Act provides, in pertinent part, that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)(A)-(B) (2010).

24.    The False Claims Act defines "knowingly" as follows:

(1) the terms knowing and knowingly –
    (A)  mean that a person, with respect to information –
     (i)  has actual knowledge of the information;
     (ii)  acts in deliberate ignorance of the truth or falsity of the information; or
     (iii)  acts in reckless disregard of the truth or falsity of the information; and

    (B)  require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1) (2010).

---

New Monthly Magazine 228 (July 1864) ("For sugar [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols the experimental failures of sanguine inventors, or the refuse of shops and foreign armories.")

25.    The False Claims Act provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus additional civil penalties for each violation.  31 U.S.C. § 3729(a)(1).

B.    The Washington State False Claims Act

26.    The Washington State False Claims Act ("FCA") is modeled after the federal False Claims Act. The Washington State FCA states, in pertinent part, that a person is liable to the State of Washington if the person:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or];

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

RCW 74.66.020(1)(a) and (b).  These terms are identical to the federal False Claims Act.

27.    The Washington False Claims Act's knowledge definitions are also functionally identical to the federal False Claims Act, stating that, "(k)nowing" and "knowingly" mean that a person, with respect to information:

(i) Has actual knowledge of the information;

(ii) Acts in deliberate ignorance of the truth or falsity of the information; or

(iii) Acts in reckless disregard of the truth or falsity of the information.

(b) "Knowing" and "knowingly" do not require proof of specific intent to defraud."

RCW 74.66.010(7)(a) and (b).

28.    The consequences for liability under the Washington FCA are also the same as the federal False Claims Act, with the Washington FCA specifying that a person is liable to the State of Washington for three times the amount of damages that the Government sustains because of the act of that person, plus additional civil penalties for each violation.  RCW 74.66.020(1).

United States' and State of Washington's Complaint in Intervention - 8

C.    <u>The Federal Health Care Programs</u>

    i.    <u>The Medicare Program</u>

29.    In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., known as the Medicare program, to provide health insurance coverage to elderly and disabled individuals.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.  CMS administers the Medicare program.  At all times relevant to this complaint, CMS contracted with private contractors, referred to as Medicare Administrative Contractors (MACs), to act as agents in reviewing and paying claims submitted by health care providers.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.  The Medicare program consists of four parts:  A, B, C, and D, the first three of which are relevant to this Complaint.

30.    As a material condition of participation in the Medicare program, Medicare regulations require providers, including MultiCare, and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516(a)(1).  To participate in the Medicare program, health care providers, including MultiCare, enter into provider agreements with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations.  As part of that agreement, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].  The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-8551.  Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment requests.  *See* 42 U.S.C. § 1320a-7b(a)(1)-(2); 42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv).

31.    In order to submit claims for payment to Medicare providers, including MultiCare, must agree that they are responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents and that all claims are accurate, complete, and truthful.  Further, in order to submit claims for payment to Medicare, providers, including MultiCare, providers must acknowledge that all claims will be paid from Federal funds, that the submission of such claims are claims for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required by Medicare may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law.  In submitting claims for payment to Medicare, providers, including MultiCare, must certify that the information on the claim form presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient.

32.    Medicare Part A generally covers inpatient hospital services, including inpatient neurosurgery services, as well as operating room and recovery room services.  In order to get paid by Medicare for services provided to Medicare patient beneficiaries, a hospital must complete and submit a claim for payment on a CMS 1450 claim form, also known as a UB-04 form, or its electronic equivalent (herein collectively "CMS 1450 claim forms").  The CMS 1450 claim form contains patient-specific information including diagnosis (as identified with ICD-10 or ICD-9 codes described below) and types of services that are assigned or provided to the Medicare patient beneficiary (as identified with CPT codes described below).  The Medicare program relies upon the accuracy and truthfulness of CMS 1450 claim forms to determine whether the service is payable and what amounts the hospital is owed.  In

United States' and State of Washington's Complaint in Intervention - 10

addition, and at the end of each fiscal year, a hospital submits to the MAC a form referred to as a "cost report," which identifies any outstanding costs that the hospital is claiming for reimbursement that year. The cost report serves as the final claim for payment that is submitted to Medicare. The Medicare program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

33. Medicare Part B generally covers outpatient services, including outpatient physician visits and consultations, as well as follow-up care after surgery. In order to bill Medicare Part B, a physician must submit a claim form called a CMS 1500, or its electronic equivalent, (herein collectively "CMS 1500 claim forms") to their carrier. When the CMS 1500 claim form is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were medically indicated and necessary for the health of the patient. For a CMS 1500 claim form to be paid by Medicare Part B, the claim must identify each service rendered to the Medicare patient beneficiary by the physician. The service is identified through a corresponding code that is listed in the American Medical Association (AMA) publication called the Current Procedural Terminology (CPT) Manual. The CPT is a systematic list of codes for procedures and services performed by or at the direction of a physician. Each procedure or service is identified by a five-digit CPT code.

34. In addition to the CPT Manual, the AMA publishes the International Classification of Diseases Manual, which assigns a unique alphanumeric identifier (ICD-10) or numeric identifier (ICD-9) to each medical condition. In order to be payable by Medicare, the CMS 1500 claim form must identify both the CPT code that the provider is billing for and the corresponding ICD-9 or ICD-10 code that identifies the patient's medical condition that renders the provider's service medically necessary.

United States' and State of Washington's Complaint in Intervention - 11

35.    Accordingly, for patients who were traditional Medicare fee-for-service beneficiaries upon whom Dr. Dreyer performed surgery while he was employed at MultiCare, MultiCare billed Medicare (through the MAC) under both Part A and Part B for Dr. Dreyer's services by submitting and causing to be submitted CMS 1450 claim forms, cost reports, and CMS 1500 claim forms.

36.    Medicare Part C, sometimes called Medicare "Advantage", covers Medicare beneficiaries who elect to receive Medicare benefits through health care plans offered by private insurance companies (MA Plans) that are required to provide coverage that is at least as comprehensive as traditional Medicare coverage.  With respect to beneficiaries who elect to receive benefits under Part C, Medicare pays a fixed amount every month for the beneficiary to the MA Plan.  MA Plans must follow coverage rules set by Medicare, but MA Plans can charge different out-of-pocket costs and have different rules for how beneficiaries access services (for example, requiring beneficiaries to use participating "in network" providers, or requiring beneficiaries to have a referral to see a specialist).  With respect to Dr. Dreyer's patients who were Part C beneficiaries, MultiCare submitted (and caused to be submitted) claims to, and received reimbursement from, the MA Plan.

ii.    The Medicaid Program

37.    Washington State's Medicaid program is a means-tested benefit program providing healthcare coverage to low income people. It was established pursuant to Title XIX of the Social Security Act. §1901. *See also* 42 U.S.C. §1396, *et seq.*; 42 CFR 430.1 *et seq.*; RCW 74.09.035. Medicaid is a joint federal-state program that provides health care and other benefits for certain groups of people, primarily people experiencing poverty and the disabled. The federal government provides matching funds and ensures that states participating in the Medicaid program comply with minimum standards. Social Security Act § 1903(a)(1). So long as the state's Medicaid program is administered in compliance with federal requirements, the federal government pays a share of the program costs known as the Federal Medical

United States' and State of Washington's Complaint in Intervention - 12

Assistance Percentage (FMAP). The states pay the remaining portion, known as the State Medical Assistance Percentage (SMAP). While the percentage has changed from year to year, the federal/state percentage share for Washington is typically 45-55.

38.    All funds administered through a Medicaid managed care delivery system are paid for by the federal and state governments using dedicated Medicaid program dollars.

39.    States participating in the Medicaid program are required to submit a plan to the U.S. Department of Health & Human Services, Centers for Medicare and Medicaid Services (CMS). Social Security Act § 1902; 42 U.S.C. 1396a. The state plan is a formal, written agreement between a state and the federal government, submitted by the single state agency (SSA) and approved by CMS, describing how the state will administer its Medicaid program. 42 CFR § 431.10. The Washington Medicaid plan, which was approved by CMS, defines eligibility criteria, client benefits, and provider reimbursement rules. RCW 74.09.510; RCW 74.09.520. Within several Washington Medicaid programs, medical services and equipment are supplied to Medicaid clients by private or public providers that enroll in the Medicaid program and execute a contract with the Washington State Healthcare Authority.[2]

40.    HCA pays enrolled providers and/or managed care organizations (MCO) for services or equipment provided to Medicaid clients according to HCA's regulations, billing instructions, and the terms of the HCA core provider agreement (CPA) or managed care contracts (MCC). 42 U.S.C. §§ 1396b(a)(1). For example,

---

[2] Prior to July 2011, the Washington Medicaid program was administered primarily by the Department of Social and Health Services (DSHS).  On July 1, 2011, HCA became responsible for administering the Medicaid program.  DSHS and HCA are collectively referred to as the Washington Single State Agency or "WA-SSA."

United States' and State of Washington's Complaint in Intervention - 13

"[t]he Agency only pays claims submitted by or on behalf of a supplier or contractor of service that has an approved [CPA] with the agency…." WAC 182-502-0005(1). The Washington State Medicaid program relies on providers complying with the terms of the CPA on an ongoing basis, and specifically in their submission of claims for payment. In short, providers are expected to submit truthful and accurate claims. Claims tainted by fraud or illegal kickbacks are ineligible for payment and punishable by criminal and/or civil action.

iii.   VA Community Care, FEHB, and TRICARE

41.   With respect to MultiCare and Dr. Dreyer patients who were VA beneficiaries who participated in the VA Community Care program, MultiCare submitted (and caused to be submitted) claims to, and received reimbursement from, the VHA.

42.   With respect to MultiCare and Dr. Dreyer patients who were TRICARE beneficiaries, MultiCare submitted (and caused to be submitted) claims to, and received reimbursement from, the TRICARE plan contracted with DoD to administer TRICARE.

43.   With respect to MultiCare and Dr. Dreyer patients who were FEHB Program beneficiaries, MultiCare submitted (and caused to be submitted) claims to, and received reimbursement from, the FEHB plan elected by the beneficiary and contracted with OPM to administer FEHB program benefits.

44.   Whether submitted to Medicare Part A, Medicare Part B, Medicare Part C, Medicaid, VA Community Care, TRICARE, or FEHB, each request for reimbursement submitted by MultiCare constituted a "claim" under the False Claims Act because each request was either:

(i)   presented to an officer, employee, or agent of the United States; or

(ii) was made to a contractor, grantee, or other recipient, for money to be spent or used on the United States' behalf and to advance a United States government

program or interest, and because the United States Government provided and/or reimbursed all or part of the money or property requested or demanded. 31 U.S.C. § 3729(b)(2).

      iv.   <u>Medical Necessity and Appropriateness of Care</u>

45.    As a material condition of reimbursement under each federal health care program, neurosurgery services and procedures were required to be medically reasonable and necessary. *See, e.g.,* 42 U.S.C. § 1395y(a) (excluding from Medicare and Medicaid coverage any item or service that is not "reasonable and necessary"); 42 C.F.R. § 424.10(a) (physicians and medical providers who seek reimbursement under the Medicare Act must certify the *necessity* of the services); 10 U.S.C. § 1079(a) (excluding from TRICARE coverage any service or supply that is "not medically or psychologically necessary"); 38 U.S.C. § 1710(a)(1) (providing that the VA "shall furnish hospital care and medical services *which the Secretary deems to be needed*") (emphasis supplied); *In re: Eargo Securities Litigation*, 656 F. Supp. 3d 928, 934 (N.D. Cal. 2023) (FEHBP insurance carriers typically condition claim reimbursements on a determination of medical necessity).

46.    With respect to Medicare, the Secretary of Health and Human Services determines whether a particular medical procedure or service is "reasonable and necessary" by promulgating generally applicable rules and determinations, and/or by permitting local coverage determinations and individual adjudication by Medicare Administrative Contractors known as MACs.  In making such individual claim determinations and in enacting local coverage determinations, MACs "shall consider a service to be reasonable and necessary if the contractor determines that the service is (1) safe and effective; (2) not experimental or investigative; and (3) appropriate." Centers for Medicare & Medicaid Services (CMS), *Medicare Program Integrity Manual* § 13.5.1, 13.3 (2015).  In determining whether a service is "appropriate," MACs consider whether it is "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve

United States' and State of Washington's Complaint in Intervention - 15

the function of a malformed body member." *Id.*, § 13.5.1.  CMS further defines a "reasonable and necessary" service as one that "meets, but does not exceed, the patient's medical need."  *Id.*, § 13.5.4; *see also* CMS, Medicare & You 2020: the Official U.S. Government Medicare Handbook 114 ("medically necessary" means health care services that are "needed to diagnose or treat an illness, injury, condition, disease, or its symptoms *and that meet accepted standards of medicine*.") (emphasis supplied).

47.    As a material condition of the Medicare program, Medicare providers must therefore certify and assure that they will provide services: (1) "economically and only when, and to the extent, medically necessary"; (2) that meet professionally recognized standards of health care; and (3) that are supported by evidence of medical necessity and quality."  42 U.S.C. § 1320c-5(a).  To that end, the Medicare statute specifically excludes from payment any procedure or service that is not supported by adequate documentation in support of the reasonableness, necessity, and appropriateness of the procedure or service.  42 U.S.C. § 1395l(e).  Moreover, as a material condition of receiving Medicare reimbursement, providers must certify that the services are medically necessary and appropriate, performed in accordance with professional standards, and are supported by adequate medical evidence and documentation.  *See* 42 U.S.C. § 1395f(a) (Medicare Part A), 1395n(a) (Medicare Part B).

48.    When MultiCare submitted and caused to be submitted claims for payment to federal health care programs, including Medicare, for the costs of Dr. Dreyer's services and related medical costs, including via CMS 1450 claim forms, cost reports, and CMS 1500 claim forms, it was certifying as a material condition of payment that, among other things, the costs were related to services that were medically necessary and appropriate, performed in accordance with professional standards, and were supported by adequate medical evidence and documentation.

//

United States' and State of Washington's Complaint in Intervention - 16

C.    Neurosurgery at MultiCare

49.    During the time period relevant to this Complaint, MultiCare owned and operated MultiCare Deaconess Hospital and MultiCare Rockwood Clinic Neurosurgery and Spine Center (MultiCare Rockwood Neurosurgery), both located in Spokane, Washington.  Between July 1, 2019 and March 31, 2021, MultiCare, through Deaconess and Rockwood Neurosurgery, submitted claims to and accepted reimbursement from Medicare, Medicaid, the FEHBP, TRICARE, VA Community Care, and other federally-funded health care programs for neurosurgery and other services provided at and by Deaconess and Rockwood Neurosurgery.

50.    MultiCare holds itself out as having values that include:

- "Integrity: We speak and act honestly to build trust";
- "Stewardship: We develop, use, and preserve our resources for the benefit of our customers and the community";
- "Excellence: We hold ourselves accountable to excel in quality of care, personal competence, and operational performance"; and
- "Kindness: We always treat everyone we come into contact with as we would want to be treated."

51.    MultiCare further holds itself as having a "Culture" of "creating an environment of trust", "creating high reliability", "seeking to be error and harm free", "cultivating an organizational commitment to life-long learning and performance excellence", "embrace service excellence principles", and being a "champion for the community and the people that we serve."

52.    During the time period relevant to this Complaint, neurosurgeons employed at MultiCare Rockwood Neurosurgery, including Dr. Jason A. Dreyer, consulted with and examined patients at MultiCare Rockwood Neurosurgery and performed neurosurgery at Deaconess.  MultiCare billed insurance, including federal health care programs, for neurosurgery services and procedures, and other services, procedures, and items incident to those neurosurgery services and procedures, based

United States' and State of Washington's Complaint in Intervention - 17

on documentation and information completed by medical personnel, including Dr. Dreyer.

53.    During the time period relevant to this Complaint, MultiCare maintained a credentialing process for its neurosurgeons, including Dr. Dreyer.  For prospective new neurosurgeons, such as Dr. Dreyer, the process included obtaining information from Dr. Dreyer, former employers, references, and other pertinent sources.

54.    During the time period relevant to this Complaint, new neurosurgeons at MultiCare were initially paid on a salaried basis during their "start-up period." Neurosurgeons could then request to be placed on a "production" model of compensation based on wRVUs.

55.    wRVUs, or Work Relative Value Units, are a standard unit of measurement used to establish value for health care procedures.  wRVUs for particular services and procedures were calculated based on a value assigned under the Medicare Physician Fee Schedule. The more complex a procedure, and the more revenue it generated for MultiCare, the greater the number of wRVUs received by the neurosurgeon. Under MultiCare's production model, neurosurgeons were paid a set amount for each wRVU generated for a procedure or service they personally performed.   Under MultiCare's production model, neurosurgeons, were paid compensation for each wRVU that they generated, with no cap on the wRVU-based compensation that could be earned. In this manner, the greater the number procedures of higher complexity that the neurosurgeon performed, the greater the compensation the neurosurgeon received, and the neurosurgeon would always have a financial incentive for performing additional surgeries of higher complexity.

D.    The National Practitioner Data Bank

56.    The National Practitioner Data Bank ("NPDB") is a web-based repository of reports containing information on certain adverse actions related to health care practitioners and suppliers.  The NPDB was created by Congress, and is

administered by the Health Resources and Services Administration of the United States Department of Health and Human Services.

57.     Federal regulations require eligible entities, which include hospitals and other health care entities, to report certain adverse actions related to health care providers, including doctors to the NPDB.  Hospitals are also required to query the NPDB when a doctor applies for medical staff appointment or for clinical privileges at the hospital.  Hospitals are also required to query the NPDB every two years on all doctors who are on their medical staff or who hold clinical privileges with them.  In this manner the NPDB assists in promoting quality health care and deterring fraud and abuse within the American health care system.

58.     As eligible entities, hospitals are required by federal regulations to report certain adverse actions regarding doctors who have clinical privileges with them to the NPDB.  Clinical privileges include privileges, medical staff membership, and other circumstances (e.g., network participation and panel membership) in which a doctor or other health care practitioner is permitted to furnish medical care by a health care entity.

59.     Adverse actions requiring mandatory reporting to the NPDB include any professional review action that adversely affects the clinical privileges of a doctor for a period of more than 30 days *or* the acceptance of the surrender of clinical privileges, or any restriction of such privileges by a doctor, (1) while the doctor is under investigation by a health care entity relating to possible incompetence or improper professional conduct, or (2) in return for not conducting such an investigation or proceeding.

60.     Adverse clinical privileges actions that *must* be reported to the NPDB are professional review actions - that is, they are based on a doctor's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient. Generally, the entity that takes the clinical privileges action determines whether the doctor's professional competence or professional

conduct adversely affects, or could adversely affect, the health or welfare of a patient. Hospitals and other health care entities *must* report clinical privileges actions taken against doctors when those actions meet the criteria for reportability to the NPDB.

61.     Where a hospital, based on an assessment of professional competence, assigns a proctor to a doctor for a period of more than 30 days and requires the doctor to obtain approval from the proctor before performing procedures, the hospital is required to submit an adverse clinical privileges report to the NPDB. However, where a hospital, based on an assessment of professional competence, assigns a proctor to a doctor for a period of more than 30 days but does not require the doctor to obtain approval from the proctor before performing procedures, the hospital is not required to submit an adverse clinical privileges report to the NPDB. Reports of adverse actions to the NPDB are confidential and are not available to the public but can be queried by eligible entities including hospitals.  Eligible entities, such as hospitals, who substantially fail to comply with federal regulations requiring the submission of adverse clinical privilege reports to the NPDB face losing, for up to three years, their state and federal civil liability immunity protections provided under 42 U.S.C. § 11111 for professional review actions taken against doctors based on their professional competence and professional conduct.

## IV.    THE FRAUDULENT SCHEME

62.     MultiCare hired, credentialed, employed, and supervised Dr. Dreyer as a neurosurgeon allowing him to operate on hundreds of patients in Spokane, Washington, despite knowing that Dr. Dreyer had engaged in a pattern of dangerous and fraudulent conduct by falsifying patient diagnoses to justify medically unnecessary surgeries, operating without clear medical indications, performing medically unnecessary surgeries and over-operating, performing procedures below the applicable standard of care, and billing for procedures not performed.  MultiCare knowingly incentivized Dr. Dreyer, through its system of un-capped wRVUs, to conduct a high volume of complex spinal surgeries, paying Dr. Dreyer millions in

order to allow MultiCare to bill for millions more including from federal health care programs. As a result, MultiCare submitted, and caused to be submitted, materially false and fraudulent claims for payment to federal health care programs for the professional services of Dr. Dreyer and related medical costs. Had the federal health care programs known that MultiCare's claims for payment for Dr. Dreyer's professional services and related medical care were for medically unnecessary surgeries and/or were not medically indicated and/or were based on falsified diagnoses and/or were performed below the applicable standard of care and/or were not performed, those programs would not have paid the resulting false claims for payment.

63.    MultiCare submitted, and caused to be submitted, false and fraudulent claims for payment to federal health care programs for Dr. Dreyer's spinal surgeries and related medical care while:

- knowing, during the hiring and credentialing processes, that Dr. Dreyer's previous employer, Providence St. Mary, had placed Dr. Dreyer on extended administrative leave and suspended his hospital privileges based on concerns that Dr. Dreyer had over-operated and performed medically unnecessary surgeries and that Dr. Dreyer and ultimately resigned as a result;

- receiving warnings from multiple medical professionals at MultiCare, with direct knowledge of Dr. Dreyer's surgeries, that Dr. Dreyer was performing medically unnecessary surgeries at MultiCare and posed a danger to patients;

- receiving an explicit detailed written notification from federal investigators that Dr. Dreyer was under federal investigation for falsifying diagnoses, fraudulent billing, and conducting medically unnecessary spinal surgeries at his previous employer, as well as detailed supporting information outlining concerns of fraudulent billing, falsified diagnoses, and medically-unnecessary procedures; and

United States' and State of Washington's Complaint in Intervention - 21

-   knowing that Dr. Dreyer was under investigation by the Washington State Department of Health Board of Osteopathic Medicine and Surgery ("State Board of Osteopathic Surgery").

64.    MultiCare did not stop Dr. Dreyer from performing surgeries at MultiCare despite its knowledge of the danger he posed to the public and the resulting false and fraudulent claims it was submitting, and causing to be submitted,  to federal health care programs for millions of dollars in federal funds, and instead took steps to insulate Dr. Dreyer from scrutiny allowing him to continue his high volume of complex surgeries and generate additional revenue and profits for MultiCare through its continued knowing submission of materially false and fraudulent claims to federal health care programs.

65.    MultiCare billed multiple federal health care programs for millions of dollars for Dr. Dreyer's spinal surgeries, including submitting, and causing to be submitted, materially false and fraudulent claims for payment for Dr. Dreyer's professional services and related medical costs to federal health care programs, between July 2019 and March of 2021.  MultiCare only ceased submitting, and causing to submit, materially false and fraudulent claims for payment to federal health care programs for Dr. Dreyer's professional services and related medical costs, after the Washington State Department of Health Board of Osteopathic Medicine and Surgery found that Dr. Dreyer's spinal surgeries posed an immediate danger to public safety and prevented him, despite MultiCare's efforts to convince the Board otherwise, from conducting any more spinal surgeries unless approved by two board certified neurosurgeons, with one of the two board certified neurosurgeons having no financial ties to MultiCare.

**A. Dr. Dreyer's Medically Unnecessary Surgeries at Providence St. Mary in Walla Walla, Washington**

66.    Between 2012 and 2019, Providence Health and Services-Washington ("Providence"), a subsidiary of Providence Health and Services, owned and operated

United States' and State of Washington's Complaint in Intervention - 22

St. Mary Medical Center, a hospital in Walla Walla, Washington ("Providence-St. Mary"). Providence-St. Mary had multiple departments including a neurosurgery department.

67. In July 2013, Providence hired Dr. Jason A. Dreyer, D.O., as a neurosurgeon in the Providence-St. Mary neurosurgery department. At that time, the neurosurgery department consisted of two other neurosurgeons, one of whom was the Providence St. Mary Medical Director of Neurosurgery, Dr. David Yam.

68. Between July 13, 2013 and May 22, 2018, Dr. Dreyer performed a high volume of multi-level spinal surgeries relative to other neurosurgeons nationally. From 2014 through 2018, Dr. Dreyer's productivity exceeded the 90th percentile of physician market survey data and he was among the top producing neurosurgeons in the Providence system.

69. While employed at Providence-St. Mary, Dr. Dreyer was responsible for completing, and did complete, his own billing fee sheets for the surgeries he performed. In completing his fee sheets, Dr. Dreyer was responsible for truthfully and accurately identifying the appropriate Current Procedural Terminology (CPT) code(s) for the surgeries he performed so that Providence-St. Mary could appropriately bill insurance providers including federal health care programs such as Medicare, Medicaid, TRICARE, VA Community Care, and the Federal Employee Health Benefits Program.

70. During his time at Providence, Dr. Dreyer was responsible for diagnosing patients to determine if they had the appropriate indications for surgery from a medical necessity standpoint, whether they were good candidates for a specific surgery, and the scope of the surgery. Such diagnoses typically consisted of reviewing a prospective patient's medical history, performing a physical exam and surgical consultation with the patient, and reviewing a patient's medical imaging to determine the extent and nature of any spinal disease, injury, or deformity. Dr. Dreyer was further responsible for truthfully and accurately documenting his diagnosis for each

patient that justified any surgery so that the ultimate payor, including federal health care programs, could determine if payment was appropriate under the guidelines in place for each carrier.

71.     During Dr. Dreyer's employment at Providence, he received compensation based on his personal productivity.  Providence measured a neurosurgeon's productivity using wRVUs. Consequently, while employed at Providence St. Mary, the more wRVUs Dr. Dreyer claimed to have performed at Providence-St. Mary in a year, the more he was paid.  Moreover, more complex and costly procedures typically had higher assigned values under the Medicare Physician Fee Schedule, and therefore were typically assigned a higher number of wRVUs. At Providence-St. Mary, Dr. Dreyer did not have any cap on the number of wRVUs he could earn towards increasing his compensation.

72.     During Dr. Dreyer's employment at Providence, Providence became aware of significant concerns held and expressed by Neurosurgery Medical Director Dr. David Yam and by other medical personnel about Dr. Dreyer.  These concerns included concerns and allegations that Dr. Dreyer: (1) completed medical documentation with falsified, exaggerated, and/or inaccurate diagnoses that did not accurately reflect the patient's true medical condition in order to obtain reimbursement for surgical procedures performed by Dr. Dreyer; (2) performed surgical procedures that did not meet the medical necessity guidelines and requirements for reimbursement set forth by Medicare and other government health insurance programs; (3) "over-operated", i.e., performed a surgery of greater complexity and scope than was indicated and medically appropriate or reasonable; (4) jeopardized patient safety by attempting to perform an excessive number of overly complex surgeries; (5) endangered the safety of Providence-St. Mary patients; (6) created an excessive level of complications, necessary additional operations, and negative outcomes including death and permanent injury as a result of his surgeries; (7) performed surgical procedures on certain candidates who were not appropriate candidates for surgery

given their medical histories, conditions, and contraindications; (8) failed to adequately and accurately document certain procedures, diagnoses, and complications; and (9) knowingly and inappropriately completed billing sheets and other documentation that caused Medicare and other health insurance programs to be falsely and fraudulently billed for medically unnecessary and inappropriate neurosurgical services.

73.    On May 22, 2018, as a result of concerns articulated by Providence-St. Mary medical staff, Providence placed Dr. Dreyer on administrative leave and initiated an independent analysis of certain concerns articulated as to Dr. Dreyer with regard to certain specific patients. On November 13, 2018, Dr. Dreyer submitted his letter of resignation to Providence, which Providence accepted. Providence did not report Dr. Dreyer to the National Practitioner Data Bank or the Washington State Department of Health.

74.    On March 15, 2022, Providence resolved the allegations by the United States and the State of Washington that it had violated the federal False Claims Act and the Washington State False Claims Act, by paying a total settlement amount to the United States and the State of Washington of $22,690,458, of which $10,459,388 was restitution for the false and fraudulent claims for Dr. Dreyer's surgeries paid to Providence by federal health care programs.  As part of that resolution, Providence admitted to facts including the facts alleged supra at paragraphs 71 and 72.

## B. The Washington State Department of Health's Investigation of Dr. Dreyer

75.    On March 4, 2019, Dr. M.F., a neurosurgeon who at that time had practiced in Richland, Washington, for 14 years, submitted a 116-page complaint with the Washington State Department of Health's Health Systems Quality Assurance, alleging and detailing that while at Providence St. Mary Dr. Dreyer had falsified diagnoses and conducted medically unnecessary surgeries.  Dr. M.F. wrote in his complaint to the Washington State Department of Health:

United States' and State of Washington's Complaint in Intervention - 25

I am writing this document to summarize a number of patient care concerns that have come to my attention regarding the neurosurgery group at Providence St. Mary's in Walla Walla and Dr. Jason Dreyer in particular.  These issues have become evident to me primarily from patients seeking a second opinion following spinal surgery procedures that were done at St. Mary's as well as patients being transferred to [the hospital where Dr. M.F. worked] from St. Mary's.  After it became clear to me that this was not an isolated occurrence, I began to keep a record of the patients I encountered from St. Mary's and this is my summary and review of the most troubling cases.  The majority of these cases involve Dr. Jason Dryer, DO and I have limited this document to the 11 of the most egregious cases.

76.     Dr. M.F.'s 116-page complaint to the Washington State Department of Health of what Dr. M.F. considered to be the 11 most egregious cases were all Dr. Dreyer surgeries and contained falsified diagnoses, medically unnecessary surgeries and false statements by Dr. Dreyer regarding the surgery actually performed.   Dr. M.F. informed the Washington State Department of Health that "[m]any of these cases represent fraud, deception, and a blatant disregard for the truth," and that "the motivating factor here in these cases, in my opinion, is pure and simple greed." Specifically, Dr. M.F. concluded that the reason that Dr. Dreyer had falsified diagnoses, over operated, and conducted medically unnecessary surgeries was "[t]o secure insurance approval and justification for fusion surgery and to generate large numbers of RVUs. . ."  Dr. M.F. advised that Dr. Dreyer should not be allowed to continue as a neurosurgeon.

77.     On May 6, 2019, the Washington State Department of Health Office of Investigative and Legal Services notified Dr. Dreyer that it had received a complaint (Dr. M.F.'s) regarding Dr. Dreyer's patient care.

78.     On May 31, 2019, Dr. Dreyer's attorney contacted the Healthcare Investigator assigned to Dr. M.F.'s complaint and advised that he represented Dr. Dreyer in the matter under investigation.

79.     On July 16, 2019, the Healthcare Investigator notified Dr. Dreyer that:

It is alleged that you have repeatedly overstated or exaggerated dynamic instability to justify fusion surgeries and that you in general overstate what was actually carried out in the procedures. It is also alleged that your clinical notes, history & physicals, and operative notes are worded in a nearly identical format.

The Healthcare Investigator then identified the 11 patients and surgical procedures that were part of the complaint and informed Dr. Dreyer that he was required to respond to each.

80.     On February 4, 2020, Dr. Dreyer submitted his response to Dr. M.F.'s complaint, which included expert reviews commissioned by Dr. Dreyer in his defense.

81.     On January 21, 2021, as part of the Department of Health's investigation of Dr. M.F.'s allegations regarding Dr. Dreyer's surgeries, an independent neurosurgeon reviewed the surgeries and submitted an expert report to the State Board of Osteopathic Surgery. That independent expert report confirmed Dr. M.F.'s expert review as to 7 of Dr. Dreyer's surgeries where the preoperative imaging and physical exams did not provide the medical indications for the various planned surgeries. Specifically, the independent expert summarized that:

In culmination, these cases highlight a pattern of extensive spinal surgery that appears to be out of proportion to indications and documentation. In addition, there are significant operative irregularities the [sic] display a clear pattern of overstating the surgery that is being performed.

82.     The State Board of Osteopathic Surgery reviewed Dr. Dreyer's response to Dr. M.F.'s complaint, including Dr. Dreyer's experts' review of the 11 cases at issue, and the Department of Health's independent neurosurgeon's expert review, and on March 5, 2021, the State Board of Osteopathic Surgery filed its Statement of Charges against Dr. Dreyer regarding seven of Dr. Dreyer's surgeries and alleging that as to those surgeries Dr. Dreyer had "practiced below medical standards of care by performing extensive spine surgeries without clear medical indications" and that Dr. Dreyer had "overstated the Patients' diagnosis of 'dynamic instability' to justify

spinal fusion surgeries, over stated treatments performed during spine surgeries, and inadequately charted in Patients' records. . . ."

83.    On March 12, 2021, the State Board of Osteopathic Surgery made findings of fact and concluded, on an *ex parte* and expedited basis, that based on Dr. Dreyer's conduct, between August 2014 and January 2017, Dr. Dreyer posed- at that time in 2021 while conducting surgeries for MultiCare- an immediate threat to public health and safety, and summarily prohibited Dr. Dreyer from performing spinal surgeries pending further proceedings.

84.    On March 25, 2021, as part of Dr. Dreyer's response to the State Board of Osteopathic Surgery's *ex parte* findings of fact and summary prohibition, MultiCare attempted to overturn or alter the summary prohibition on Dr. Dreyer performing spinal surgeries by having its Medical Director for Surgical Services provide a declaration which contained misleading assurances that there appeared to be no issues with Dr. Dreyer's surgeries at MultiCare, incorrectly providing that MultiCare had procedures in place sufficient to address any patient safety concerns, and highlighting the need to have Dr. Dreyer able to conduct surgeries "to ensure that patients in our area receive timely, competent medical care."

85.    Despite Dr. Dreyer's response and MultiCare's misleading assurances, on April 26, 2021, the State Board of Osteopathic Surgery made the same specific findings of fact that Dr. Dreyer, based on his conduct between 2014 and 2017, posed an immediate threat to public health at MultiCare. Specifically, the State Board of Osteopathic Surgery found that while at Providence St. Mary:

- Dr. Dreyer practiced below medical standards of care by performing extensive spinal surgeries without clear medical indications;
- Dr. Dreyer performed unjustified extensive spinal surgeries for financial gain;

United States' and State of Washington's Complaint in Intervention - 28

- Dr. Dreyer showed a pattern of misrepresenting and/or overstating diagnosis of instability for multiple patients of Providence in order to justify spinal fusion surgeries; and

- Dr. Dreyer misrepresented and/or overstated treatments performed during spinal surgeries.

86.    Despite MultiCare's misleading assurances, the State Board of Osteopathic Surgery found that Dr. Dreyer posed an immediate danger to the public, which included MultiCare's own patients, and ordered that Dr. Dreyer could only conduct spinal surgeries approved by two separate board-certified neurosurgeons one of whom must not work for MultiCare or have any financial interest in MultiCare.

87.    Upon Dr. Dreyer's suspension by the State Board of Osteopathic Surgery, MultiCare reassigned Dr. Dreyer's surgical patients to other neurosurgeons at MultiCare including assigning Dr. A.T. 12 patients on which Dr. Dreyer had planned to perform spinal surgery.  Dr. A.T. determined that none of the twelve former patients of Dr. Dreyer were appropriate for spinal surgery.

### C. MultiCare Hired Dr. Dreyer Knowing that he Posed a Danger to the Public.

88.    On March 16, 2019, less than two weeks after Dr. M.F. made his complaint to the Washington State Department of Health, Dr. Dreyer emailed MultiCare's Medical Director for Surgical Services, Dr. J.D., and another neurosurgeon at MultiCare, inquiring about an opportunity to practice at MultiCare, which Dr. Dreyer had heard about through a mutual acquaintance, with initials J.U., a sales representative for and distributor of surgical implants, primarily spinal implants.

89.    At that time MultiCare was searching for additional neurosurgeons to keep up with and expand its neurosurgery practice.  During that time MultiCare was short staffed and needed additional neurosurgeons to adequately service the patient volume including providing on call emergency neurosurgeon coverage.  Further, recruiting neurosurgeons for MultiCare at Deaconess Hospital was extremely difficult

United States' and State of Washington's Complaint in Intervention - 29

as neurosurgeons are in high demand and typically want to work in larger metropolitan areas. Moreover, during that time, MultiCare was attempting to establish a neuroscience institute; hiring for additional neurosurgeons would augment that effort. The individuals at MultiCare who effectively formed the selection and hiring committee for the neurosurgeon position included MultiCare's Medical Director for Surgical Services, Dr. J.D., MultiCare's Regional Administrator, with initials M.D., and MultiCare's President of Deaconess Hospital, with initials L.D.

90. During the hiring process Dr. J.D., MultiCare's Medical Director for Surgical Services, contacted J.U., the surgical implant distributor and mutual acquaintance that Dr. Dreyer had referenced in his initial email to MultiCare. At that time, it was well known in the Eastern Washington neurosurgery community, including to J.U., that Dr. Dreyer had been suspended from Providence St. Mary due to allegations of medically unnecessary surgeries.

91. During the hiring process, J.U. was contacted by MultiCare's Medical Director for Surgical Services, Dr. J.D., and discussed with Dr. J.D. the fact that Providence St. Mary had suspended Dr. Dreyer due to allegations of medically unnecessary surgeries.

92. On March 28, 2019, MultiCare's Regional Administrator, M.D., emailed MultiCare's Medical Director for Surgical Services, Dr. J.D., that an unnamed medical device sales representative had told M.D. that Dr. Dreyer had been "exonerated" of "the issues in Walla Walla".

93. During MultiCare's hiring process for Dr. Dreyer, at a MultiCare provider meeting involving MultiCare neurosurgeons the fact that Dr. Dreyer had lost hospital privileges while at Providence St. Mary was openly discussed in the context of whether or not MultiCare should even interview Dr. Dreyer for the neurosurgeon position.

94. During MultiCare's hiring process one of MultiCare's neurosurgeons, referred to as Dr. A.T., though not part of the hiring process, took it upon himself to

United States' and State of Washington's Complaint in Intervention - 30

call Dr. David Yam, then the former Providence St. Mary Medical Director of Neurosurgery, to inquire about his work with Dr. Dreyer. Dr. A.T. was aware at that time that Dr. Dreyer due to concerns at Providence St. Mary had not performed a surgery in approximately a year. Dr. Yam informed Dr. A.T. that Dr. Yam had questioned Dr. Dreyer's medical indications for surgery. Dr. A.T. informed MultiCare's Medical Director for Surgical Services, Dr. J.D. of the information provided by Dr. Yam. At that time Dr. J.D. informed Dr. A.T. that they would need to "rein in" Dr. Dreyer.

95.    On April 3, 2019, MultiCare's President of Deaconess Hospital, L.D. emailed MultiCare's Regional Administrator, M.D., for an update on the neurosurgeon hiring process and inquired why Dr. Dreyer, among other candidates, were not on her calendar to be interviewed. That same day M.D. replied to LD., and included others at MultiCare involved in the hiring process including Dr. J.D., and advised them of "some red flags" on "Dr. Dreyer's practice style and relationships that need[ed] to be clarified" during the interview process. The reference to "red flags" was a direct reference to MultiCare's concerns regarding Dr. Dreyer's surgical case selection.

96.    MultiCare and Providence were direct competitors for market share of spinal surgery patients in Eastern Washington. MultiCare was aware that by hiring Dr. Dreyer after he had worked at and established a patient base at Providence it would increase its market share of spinal surgery patients at the expense of its major competitor, Providence. MultiCare was also aware that by capturing additional market share it would increase its profit margins for spinal surgeries.

97.    On April 10, 2019, MultiCare interviewed Dr. Dreyer in person, including interviews with MultiCare's President of Deaconess Hospital, L.D. and MultiCare's Regional Administrator, M.D, and then took Dr. Dreyer out to dinner that evening in downtown Spokane.

United States' and State of Washington's Complaint in Intervention - 31

1    98.    Two days later, on April 12, 2019, MultiCare formally offered Dr. Dreyer

2    a position as a neurosurgeon.

3    99.    After being offered the position but before accepting, Dr. Dreyer

4    informed MultiCare that he needed MultiCare to purchase new surgical equipment

5    from a specific medical device manufacturer in order for him to accept the position.

6    Although, the purchase of such equipment was not then in MultiCare's capital budget,

7    MultiCare acquiesced in this late request and in so doing, based on the authorization

8    of MultiCare's President of Deaconess Hospital, L.D., secured the additional capital

9    needed to purchase the new surgical equipment and obtain Dr. Dreyer's acceptance of

10    the offer of employment.

11    100.    On May 3, 2019, Dr. Dreyer officially accepted MultiCare's offer.  That

12    same day, the meeting minutes for the MultiCare Neuroscience Institute (MNI) Spine

13    Center of Excellence (COE) Provider Team explicitly stated that Dr. Dreyer was

14    considered "a work horse" but noted that MultiCare "may need to advise him on what

15    type of surgeries are appropriate and what is not tolerated."  MultiCare's Regional

16    Administrator, M.D., reviewed those meeting minutes and directed that the references

17    to Dr. Dreyer needing to be advised on "what type of surgeries are appropriate and

18    what is not tolerated," be taken out of the meeting minutes.

19    101.    Once Dr. Dreyer had accepted MultiCare's offer to hire him as a

20    neurosurgeon, MultiCare began its credentialing process.  The credentialing process

21    was fast tracked due to MultiCare's urgent need for neurosurgeons at that time and

22    other factors including Dr. Dreyer traveling to South Africa for a film project he was

23    working on.  At no time during the MultiCare credentialing process did those involved

24    in the hiring process for Dr. Dreyer, including MultiCare's President of Deaconess

25    Hospital, L.D., MultiCare's Regional Administrator, M.D., or MultiCare's Medical

26    Director for Surgical Services, Dr. J.D, inform MultiCare's credentialling committee

27    of any of the red flags, concerns, and direct evidence regarding Dr. Dreyer's medically

28

unnecessary surgeries while he was practicing as a neurosurgeon at Providence St. Mary nor any of the concerns they had regarding Dr. Dreyer's clinical judgment.

102.     As part of the credentialing process MultiCare received a peer reference, dated May 20, 2019, for Dr. Dreyer from another doctor.  In answer to the question "To the best of your knowledge is/was the practitioner under any kind of focused review as a result of concern raised by the medical staff?"  the doctor responded "Yes".  The doctor went on to provide in the peer reference that "Medical staff completed a focused review based on concerns raised by a medical staff member.  No significant issues were identified by the medical staff.  And the only recommendation was that all elective neurosurgery patients take part in a multidisciplinary evaluation pre-operatively.  This is a common feature of many of our service lines."

103.     Notwithstanding all of the above, MultiCare credentialed Dr. Dreyer and allowed him to begin operating on patients in Spokane, Washington.

**D. Despite Knowing the Danger Dr. Dreyer Posed to the Public, MultiCare Allowed Dr. Dreyer to Operate on Patients and Financially Incentivized Dr. Dreyer's High Volume of Complex Surgeries.**

104.     On or about July 23, 2019, Dr. Dreyer, now fully credentialed by MultiCare, began operating on patients at MultiCare Deaconess Hospital and MultiCare Rockwood Neurosurgery, both located in Spokane, Washington.  Under Dr. Dreyer's employment contact with MultiCare, he was to be paid an annual salary of $797,000.  However, MultiCare allowed Dr. Dreyer to move from a flat salary to a wRVU production based salary by October 1, 2019. Under this compensation model, Dr. Dreyer was paid more the more wRVUs he produced, with no cap on the amount he could ultimately earn.

105.     Under the terms of MultiCare's employment contract with Dr. Dreyer, Dr. Dreyer assigned to MultiCare "any rights [Dr. Dreyer] may have to payments

made by Medicare for services rendered by [Dr. Dreyer]." In addition, the employment contract provided in pertinent part:

> [MultiCare] shall bill, collect and retain all professional fees for Professional Medical Services rendered by [Dr. Dreyer] under this Agreement, whether such Professional Medical Services are provided to patients in the Medical Office, in the Hospital or any other location (the "Professional Fees"). [MultiCare] shall determine in its sole discretion the amounts of the Professional Fees to be charged to patients for [Dr. Dreyer's] Professional Medical Services. [MultiCare] or an agent of [MultiCare] shall collect all of the Professional Fees.

106. Dr. Dreyer immediately began performing complex surgeries on a high volume of patients, producing far more wRVUs than any other neurosurgeon at MultiCare. This allowed MultiCare to maximize its spinal surgery revenue from insurance providers including Medicare, Washington Medicaid, and other federal health care programs. This further allowed MultiCare to increase its profit margins on its spinal surgeries.

107. For example, during August 2019, his first full month of operating on patients for MultiCare, Dr. Dreyer was by far the most productive neurosurgeon for MultiCare in Spokane, producing 1,745 wRVUs. In comparison, MultiCare's next most productive neurosurgeon in Spokane produced 585 wRVUs during that same period. During September 2019, his second full month of operating on patients for MultiCare, Dr. Dreyer was again by far the most productive neurosurgeon at MultiCare in Spokane, producing 1,455 wRVUs. In comparison, MultiCare's next most productive neurosurgeon in Spokane produced 400 wRVUs. The same was true in October and November of 2019, when Dr. Dreyer produced 1,904 and 1,262 wRVUs, respectively, as compared to 997 and 993 wRVUs produced, respectively, by MultiCare's next most productive neurosurgeon in Spokane.

108. Within the first three months of MultiCare allowing Dr. Dreyer to operate on its patients, Dr. Dreyer had produced 6,716 wRVUs. In stark contrast, MultiCare's next most productive neurosurgeon in Spokane produced 8,566 wRVUs over the

course of 11 months. In other words, Dr. Dreyer produced approximately 2,238 wRVUs per month while MultiCare's next most productive neurosurgeon in Spokane in 2019 earned an average of only approximately 778 wRVUs per month.

109.    MultiCare was fully aware of Dr. Dreyer's immediately high wRVU production. For instance, within approximately one month of MultiCare credentialing Dr. Dreyer, MultiCare's Regional Administrator, M.D., remarked in an email that it made financial sense for a physician's assistant, with initials L.G., to be switched from a flat salary to production based compensation, based on wRVUs, because L.G. was now assigned to work primarily with Dr. Dreyer and therefore L.G.'s "current productivity supports that change now that he is working with Dr. Jason Dreyer."

110.    MultiCare quickly took steps to reward and encourage Dr. Dreyer's high wRVU production, despite knowing of the danger Dr. Dreyer posed to MultiCare patients, because it allowed MultiCare to bill far more to insurance providers, including federal health care programs. For instance, MultiCare's Regional Administrator, M.D., sent an email to MultiCare's finance department on September 11, 2019, stating:

> Jason Dreyer, our new Neurosurgeon who started in July, has quickly ramped up his practice. . . He wants to move to production on October 1, but would first like to verify that his wRVUs make that a wise choice. Hi [sic] surgery volumes suggest so. I know it usually takes couple months [sic] to get the data, but is there anything we can do to get an assessment to him?

111.    On September 16, 2019, M.D. received the requested assessment of Dr. Dreyer's wRVU production from the MultiCare finance department. This assessment projected that Dr. Dreyer would produce 11,274 wRVUs annually based on his current wRVU production. This was more than 2,000 wRVUs over MultiCare's own target of 9,230 annualized wRVUs for Dr. Dreyer. In providing Dr. Dreyer the detailed assessment of his high wRVU production, the MultiCare Regional Administrator, M.D., emailed Dr. Dreyer the following:

Hi Jason,

I just received your wRVU detail, which includes data from July 15-August 31.  Based on that analysis and assuming you can maintain your current production levels, it is advantageous for you to move to production on October 1.  By my calculations, after adjusting for the 9-week vacation allowed under the production model, you would benefit in excess of $190k annually. . . .

112.    On October 1, 2019, MultiCare formally allowed Dr. Dreyer to switch to its wRVU Production Model for his compensation prior to the end of his "start-up period."  Typically, MultiCare did not move doctors to a wRVU Production Model for compensation until after six months, but MultiCare fast tracked this change to Dr. Dreyer's compensation model.

113.    Dr. Dreyer would finish 2019 at MultiCare with 7,014 wRVUs after approximately four months of conducting surgeries.  In 2020, Dr. Dreyer produced 18,784 wRVUs and, being on the production compensation model, MultiCare paid Dr. Dreyer over $1.7 million in total compensation for that year, more than double his initial base annual salary of $797,000. Dr. Dreyer produced 3,609 wRVUs in the less than three months of 2021 that he performed surgeries for MultiCare before the Washington State Department of Health Board of Osteopathic Medicine and Surgery suspended his license because he posed an "immediate threat to public health and safety." These pre-suspension wRVUs netted Dr. Dreyer an additional $321,849 in production based compensation in 2021 from MultiCare.

**E.    Despite Knowing of Multiple Internal Complaints that Dr. Dreyer Was Harming Patients, MultiCare Continued to Incentivize Dr. Dreyer to Perform a High Volume of Complex Surgeries**

114.    A MultiCare physician's assistant, with initials L.G., who worked in neurosurgery at MultiCare Deaconess Hospital in 2019 and who worked directly with Dr. Dreyer in the operating room on dozens of spinal surgeries developed concerns, within weeks of Dr. Dreyer starting to perform surgeries at MultiCare, that Dr. Dreyer's spinal surgeries were endangering patients based on Dr. Dreyer's repeated

over-operating.  L.G. informed MultiCare management of his concerns on multiple occasions in September and October of 2019, but rather than address or meaningfully investigate L.G.'s patient safety concerns, MultiCare directed L.G. to resign from neurosurgery at MultiCare.

115.    During the MultiCare hiring process of Dr. Dreyer, and prior to having worked with Dr. Dreyer, L.G. as a part of the medical staff at MultiCare, though not part of the hiring process, was aware that Dr. Dreyer had been suspended from Providence St. Mary based on allegations of over operating on spinal surgery patients.

116.    Once Dr. Dreyer was hired by MultiCare and credentialed, L.G. was assigned to Dr. Dreyer as Dr. Dreyer's primary physician's assistant for all of Dr. Dreyer's patients, which included L.G. being tasked with assisting Dr. Dreyer in the operating room during spinal surgeries.

117.    Upon Dr. Dreyer starting to take patients and perform spinal surgeries at MultiCare, L.G. noticed that although the MultiCare spinal patient population had not changed, Dr. Dryer was performing fewer simpler procedures, such as laminectomies without other procedures added, and was performing a greater number of complex spinal surgeries than had previously been performed at MultiCare neurosurgery.  In addition, L.G. noticed that the greater number of complex surgeries did not appear to be resulting in better outcomes for patients and in fact L.G. was observing what he believed to be a high number of patients who were coming back for additional procedures or "re-dos" including a number of patients that Dr. Dreyer had operated on while at Providence St. Mary.

118.    L.G. further observed that Dr. Dreyer avoided discussing his more complex planned surgeries with the MultiCare Neuroscience Institute (MNI) Spine Center of Excellence (COE) Provider Team committee that usually met on Fridays to discussed upcoming planned surgeries.

119.    L.G.'s concerns included that Dr. Dreyer conducted a high volume of complex surgeries requiring surgical implants or other hardware, including multi-level

fusions, and rarely did simple surgeries that did not require hardware, such as laminectomies, unless they were part of a more complex procedure. L.G. observed that Dr. Dreyer had a pattern of over-operating and would add additional procedures to already complicated surgeries.

120. L.G. was also concerned with the high number of medical device sales representatives that Dr. Dreyer would allow in the operating room during spinal surgeries. Having multiple medical device sales representatives on hand in the operating room during spinal surgeries facilitated Dr. Dreyer's ability to increase the complexity of a planned surgery while operating.

121. Based on his direct observations of Dr. Dreyer's surgical practice, L.G. became so concerned about MultiCare patient safety that on or about September 20, 2019, he walked out of the operating suite during one of Dr. Dreyer's spinal surgeries to which he was the assigned physician's assistant, because he believed Dr. Dreyer's surgery was medically unnecessary and would endanger the patient. As L.G. left the operating suite he informed Dr. Dreyer that he believed that what Dr. Dreyer was doing was wrong and that Dr. Dreyer was hurting patients. As he left, L.G. informed the MultiCare office manager, with initials C.P., that he would no longer assist Dr. Dreyer in any surgeries. As he left MultiCare Deaconess Hospital at that time, L.G. saw MultiCare's Medical Director for Surgical Services, Dr. J.D., and at that time L.G. informed Dr. J.D. that Dr. Dreyer "was doing it again" referring to over-operating and endangering patients. Dr. J.D. asked L.G. which patients L.G. was concerned about and L.G. informed Dr. J.D. that he was concerned for all of Dr. Dreyer's patients at MultiCare.

122. A few days later, on or about September 23, 2019, MultiCare's Medical Director for Surgical Services, Dr. J.D., had a meeting with L.G. to further discuss L.G.'s concerns regarding Dr. Dreyer's surgeries and patient safety. That meeting was also attended by MultiCare's Regional Administrator, M.D. At that meeting, L.G. informed Dr. J.D. and M.D. that L.G. believed that Dr. Dreyer was harming his

United States' and State of Washington's Complaint in Intervention - 38

patients through over-operations and that he did not trust Dr. Dreyer as a surgeon. At that time, Dr. J.D. asked L.G. to provide the names of four of Dr. Dreyer's patients for which L.G. had concerns regarding the surgeries performed, which L.G. promptly did.

123. Approximately two weeks later, in early October 2019, Dr. J.D. called L.G. into another meeting to discuss L.G.'s concerns regarding the safety of Dr. Dreyer's patients at MultiCare. Also present at that meeting were MultiCare administrators including MultiCare's Regional Administrator M.D. Dr. Dreyer was also present. L.G. was asked to repeat his concerns and Dr. Dreyer was allowed to provide his side of the story. Dr. Dreyer's response included stating that L.G.'s injury to his right arm, received during L.G.'s military service, was hindering Dr. Dreyer's surgeries and that L.G. was less experienced than Dr. Dreyer had expected. The meeting then ended, and everyone left except for L.G., Dr. J.D., and M.D. At that time, Dr. J.D. and M.D. informed L.G. that he should resign from MultiCare neurosurgery and provide three months' notice. L.G. complied and was subsequently hired by MultiCare's urgent care. L.G. never again assisted Dr. Dreyer in any surgery.

124. Another MultiCare physician's assistant, with initials J.N., who worked in neurosurgery at MultiCare Deaconess Hospital from 2016 to 2020 and who also worked directly with Dr. Dreyer, expressed concerns for the safety of Dr. Dreyer's patients to MultiCare's Medical Director for Surgical Services, Dr. J.D, regarding Dr. Dreyer's neurosurgery practice at MultiCare. J.N.'s concerns for the safety of Dr. Dreyer's patients were based on discussion with other providers at MultiCare as well as J.N.'s medical training and treatment of specific MultiCare patients, including his knowledge and review of those patients' medical records.

125. Specifically, J.N. developed patient safety concerns with regard to Dr. Dreyer's surgical selection of patients that, at times due to extensive co-morbidities, were not appropriate candidates for surgery. J.N. expressly communicated this patient safety concern to MultiCare's Medical Director for Surgical Services, Dr. J.D.

United States' and State of Washington's Complaint in Intervention - 39

126.    J.N. also developed patient safety concerns with what J.N. viewed as Dr. Dreyer performing surgeries that were not medically indicated.    J.N. expressly communicated this patient safety concern to MultiCare's Medical Director for Surgical Services, Dr. J.D.

127.    J.N. also developed patient safety concerns with what J.N. viewed as Dr. Dreyer's excessive spinal surgeries.    J.N. expressly communicated this patient safety concern to MultiCare's Medical Director for Surgical Services, Dr. J.D.

128.    MultiCare, through its Medical Director for Surgical Services, Dr. J.D, informed J.N. that MultiCare would take appropriate steps to address J.N.'s concern for the safety of Dr. Dreyer's patients.    The Medical Director for Surgical Services, Dr. J.D., informed J.N. that he had received similar concerns from L.G.

129.    After expressing his concerns to MultiCare's Medical Director for Surgical Services, Dr. J.D, it did not appear to J.N. that appropriate steps were taken by MultiCare to protect the safety of Dr. Dreyer's patients. As a result of his concerns for the safety of Dr. Dreyer's patients, J.N. developed a practice of not referring patients to Dr. Dreyer for surgery and instead referring them to other neurosurgeons at MultiCare.

130.    Ultimately, J.N. left neurosurgery at MultiCare Deaconess Hospital because he felt that he could not work with Dr. Dreyer consistent with his ethical obligations and that MultiCare was asking J.N. to do just that.    J.N. communicated to MultiCare's Medical Director for Surgical Services, Dr. J.D, that the reason J.N. was leaving was based on his ethical concerns for even working with Dr. Dreyer.

### F. MultiCare was Explicitly Notified that Dr. Dreyer was Under Federal Investigation for Falsifying Medical Diagnoses and Conducting Medically Unnecessary Surgeries, but Allowed Dr. Dreyer to Continue Operating on Patients for Over a Year.

131.    On February 15, 2020, the United States Attorney's Office for the Eastern District of Washington ("USAO") provided an explicit written notification to

United States' and State of Washington's Complaint in Intervention - 40

MultiCare regarding the fact that Dr. Dreyer was under federal investigation and the potential danger that Dr. Dreyer posed to patient safety based on, among other things, his fraudulent billing supported by falsified diagnoses and his overall desire to maximize wRVUs.  The USAO written notification to MultiCare included specific anonymized patient data regarding dozens of medically unnecessary surgeries conducted by Dr. Dreyer while at Providence St. Mary.

132.  In its February 15, 2020, written notification to MultiCare, the USAO stated in part:

> While our investigation is ongoing, and in fact is at a very early stage, we have uncovered evidence that gives us great concern for the safety of any current patients of Dr. Dreyer.  Accordingly, we are providing this information to you to share with the appropriate persons at Deaconess so that Deaconess can have sufficient information to fully and immediately ensure the safety of its patients.

The USAO written notification to MultiCare went on to provide:

> It is the credible evidence of unnecessary surgeries, the resulting patient harm, and evidence of Dr. Dreyer creating false and fraudulent medical records (primarily his op notes apparently mischaracterizing what had occurred during his surgeries as well as false and fraudulent diagnosis supposedly justifying the unnecessary surgeries in the first place) which has caused us to provide Deaconess with this information.

133.  In its February 15, 2020, written notification to MultiCare, the USAO attached specific anonymized patient data that had been provided to the USAO by the Providence St. Mary's former Medical Director of Neurosurgery, Dr. David Yam regarding his analysis of dozens of Dr. Dreyer's surgeries while at Providence St. Mary.  These materials included dozens of detailed reviews of Dr. Dreyer's surgeries, pre-operative and post-operative patient imaging, the specific allegations regarding specified procedures on particular patients, which were not performed, double billed, contained falsified diagnoses including faked or exaggerated diagnoses of kyphosis, scoliosis, and spondylolisthesis, or were otherwise medically unnecessary, along with the resulting allegedly falsified billing and wRVUs earned by Dr. Dreyer.  By way of

example, the materials provided to MultiCare included the following statements from the then former Providence St. Mary Medical Director of Neurosurgery Dr. David Yam who had worked with and supervised Dr. Dreyer for years, each about a different Dr. Dreyer surgery:

a. "Documents severe stenosis and authorized an urgent ACDF for kyphosis and severe stenosis none of which are present."

b. "Maximum anterior and posterior cervical operations with laminectomies where no stenosis was even present. Corpectomy performed for unknown reasons to maximize billing"

c. "Documents severe stenosis at [sic] but none is present as prior laminectomies had already been performed. Performs a fusion for scoliosis that is not present and 're-performs' laminectomies that had already been done by another surgeon."

d. "Documents kyphosis and instability fraudulently justify a major fusion to maximize billing."

e. "Prior healed C4-5 fusion falsely diagnosed as non-healed and the [sic] refused again by Dr. Dreyer."

f. "Falsely documents L4-4 instability to extend the fusion."

g. "Prior C3-4 solid fusion extended to C7. C3-4 was unfused, re-fused and re-billed which was unnecessary but maximized billing."

h. "Fraudulent justification of surgery at L3-4 but also rebilled a prior decompressed level when her pre-operative images showed no lamina left to drill."

i. "Dr. Dreyer maximized billing with unnecessary cervical laminectomies adding to blood loss and cost. Dr. Dreyer then performed a maximum operation of the patient's low back making up the diagnosis of scoliosis and not performing the laminectomy he billed for."

United States' and State of Washington's Complaint in Intervention - 42

j. "Dr. Dreyer justified the operation by indicating primarily kyphosis which led to a bigger payout to Providence. His cervical x-rays showed no kyphosis."

k. "Dr. Dreyer created the diagnosis of spondylolisthesis at L3-4 to justify surgery at that level."

l. "Performs a massive surgery for mild scoliosis. Bills but imaging does not show L2 or L3 laminectomies. Her deformity is worse after surgery and will require a much more aggressive surgical correction."

m. "Prior C4-5 fusion patient. Had a highly unusual and unindicated C4 corpectomy to maximize billing when lesser surgery was indicated."

n. "Unnecessary four level cervical fusion when only two levels had pathology."

o. "Three level cervical fusion when only two levels were indicated."

p. "L3-S1 foraminal narrowing treated with an extensive fusion of L3-L5 with unnecessary midline laminectomy."

q. "Documents diffuse scoliosis in a patient with mild scoliosis that would not be considered operative. Falsely documents L4-5 instability. Fuses multiple levels as a result."

r. "Unnecessary corpectomy for maximum billing. Fusion appears to be failing in follow-up meaning more surgery will be needed."

s. "Dr. Dreyer performed another laminectomy even though no lamia remained on imaging preoperatively."

All of these specific allegations, and more, regarding Dr. Dreyer's fraudulent and falsified diagnoses, double billed and faked procedures, and medically unnecessary surgeries while at Providence St. Mary were in the possession of MultiCare on or about February 15, 2020.

134.  On or about February 17, 2020, MultiCare provided the USAO written notification and attached materials to its Director of Risk Management and on or about

United States' and State of Washington's Complaint in Intervention - 43

February 24, 2020, MultiCare leadership met to discuss the USAO written notification and attached materials.

135.   On or about February 25, 2020, MultiCare's Chief Medical Officer, Dr. G.S., created a document summarizing MultiCare leadership's understanding of the USAO written notification and materials and MultiCare's plans for addressing the situation.   The document is referred to as an SBAR, which is an acronym for: Situation, Background, Assessment, and Recommendations.

136.   MultiCare's Chief Medical Officer's SBAR provided, under the background section, that the allegations provided by the USAO were that "Dr. Dreyer, at a previous site; 1) exhibited questionable surgical decision-making, 2) excessively utilized surgical repair and instrumentation and 3) was involved in fraudulent billing practices."   The SBAR did not reference the fact that the USAO written notification explicitly stated that the concerns included medically unnecessary surgeries and resulting patient harm.

137.   MultiCare's Chief Medical Officer's SBAR went on to provide, under the background section, that "[t]he quality of this evidence was not substantiated, nor was the information sourced.   Additionally, information was received that implied there was an ongoing regulatory investigation."   However, the USAO written notification explicitly disclosed to MultiCare that there was an ongoing federal investigation and said nothing about it being a "regulatory" investigation.   Moreover, at no time during Dr. Dreyer's remaining employment with MultiCare did MultiCare request any further information or additional evidence from the USAO concerning its notification or the information in support thereof, nor did MultiCare make any other attempts to source or verify the information.

138.   MultiCare's Chief Medical Officer's SBAR went on to acknowledge, under the assessment section, that MultiCare "has a duty to ensure patient safety and correct surgical, procedural and billing integrity." The assessment then stated, "[i]t is unclear at this time if the information presented or the implied investigations are valid

or will be vetted." Contrary to this characterization, the USAO's investigation of Dr. Dreyer for performing medically unnecessary surgeries, falsifying diagnoses, and fraudulently billing federal health programs, was not "implied" but rather explicitly disclosed to MultiCare in writing. In addition, MultiCare never questioned the validity of the USAO's explicitly disclosed investigation during Dr. Dreyer's continued employment with MultiCare and acknowledged in the SBAR that regardless of the nature of the investigation or vetting of the information presented, ". . . the obligation of patient safety takes precedence over other considerations until this matter is fully investigated and an objective analysis is completed by regulatory agencies and MultiCare Health System."

139. MultiCare's Chief Medical Officer's SBAR then recommended that four actions be taken "immediately." First, MultiCare leadership was to meet with Dr. Dreyer to determine if he was aware of "this situation and/or implied investigations to determine if he adequately disclosed them prior to his employment," and to inform him if he is not aware. When MultiCare approached Dr. Dreyer subsequent to the SBAR, he disclosed the Washington State Department of Health Board of Osteopathic Medicine and Surgery's investigation and that he, Dr. Dreyer, had not disclosed it during the hiring and credentialing process at MultiCare despite knowing of it then. MultiCare took no action to suspend or even curtail Dr. Dreyer's surgeries despite this admitted lack of candor during the hiring and credentialing process.

140. The second recommendation for "immediate" action in MultiCare's Chief Medical Officer's SBAR was to:

> Immediately coordinate concurrent review and surgical oversight of any planned surgical cases using the Site Medical Manager of Neurosurgery, [Dr. J.D.] to review surgical options and planned surgical services up to and including concurrent proctoring within the operating room. [Dr. J.D.] shall have the authority to cancel planned surgeries if he deems warranted in his medical opinion.

MultiCare did not provide the USAO written notification or even the resulting SBAR to Dr. J.D. Dr. J.D. was therefore unaware, among other things, that there was an ongoing federal investigation into Dr. Dreyer focusing on falsification of diagnoses and medical documentation. This forced Dr. J.D.'s prospective "review of surgical options and planned surgical services" to rely on potentially falsified documentation, which would render it ineffective to address and guard against the concerns raised in the USAO's notification and attached materials. Similarly, MultiCare did not inform Dr. J.D. that the USAO had notified MultiCare in writing of at least one instance of Dr. Dreyer falsely justifying an emergency surgery. This was especially problematic considering that MultiCare placed emergency surgeries outside of Dr. J.D.'s presurgical review of Dr. Dreyer's surgical cases.

141.    Despite the nearly full year of supposedly conducting these presurgical reviews of all of Dr. Dreyer's planned surgical procedures, Dr. J.D. never engaged in concurrent proctoring of Dr. Dreyer in the operating room and never canceled one of Dr. Dreyer surgeries out of the hundreds Dr. Dreyer conducted while credentialed at MultiCare. Indeed, Dr. Dreyer's surgeries were only stopped at MultiCare when the Board of Osteopathic Surgery issued its immediate suspension of Dr. Dreyer's ability to perform spinal surgeries based on its findings that he posed an "immediate threat to public health and safety."

142.    The third recommendation for "immediate" action in MultiCare's Chief Medical Officer's SBAR was:

> As soon as is practical, initiate an independent objective review of at least ten (10) major surgical cases of Dr. Dreyer's since his employment at [MultiCare]. These reviews shall include a complete historical, imaging, surgical decision-making, procedural selection and billing evaluation. Further analysis or review to be conducted upon completion of the initial process.

In fact, MultiCare did not initiate any independent review of any of Dr. Dreyer's surgical cases until after the State Board of Osteopathic Surgery issued an immediate

United States' and State of Washington's Complaint in Intervention - 46

suspension of Dr. Dreyer's ability to perform spinal surgeries based on its findings that he posed an "immediate threat to public health and safety," in March of 2021.

143.   The fourth recommendation for "immediate" action in MultiCare's Chief Medical Officer's SBAR was for MultiCare's legal team to "proceed with further discovery of information if available." However, during the remainder of Dr. Dreyer's employment with MultiCare it did not follow up with the USAO regarding the source of the information the USAO had provided in its written notification, whether the USAO was aware of or in possession of additional relevant information, or where MultiCare might be able to go to obtain additional information regarding the allegations that Dr. Dreyer had falsified medical diagnoses, conducted medically unnecessary surgeries, and harmed patients.

144.   On February 26, 2020, MultiCare's Chief Medical Officer, Dr. G.S., MultiCare's Medical Director for Surgical Services, Dr. J.D., and a member of MultiCare's human resources department, with initials M.H., met with Dr. Dreyer to discuss the allegations and concerns referenced in the USAO's written notification and materials provided to MultiCare. During the meeting Dr. Dreyer stated that he was unaware of any investigation of him by the USAO regarding his surgeries conducted while at Providence St. Mary.

145.   During the February 26, 2020 meeting with MultiCare's Chief Medical Officer, Dr. G.S., and MultiCare's Medical Director for Surgical Services, Dr. J.D., Dr. Dreyer also stated that he was only aware of a broad inquiry that Providence conducted while he was employed there that included all Providence neurological services system-wide. Dr. Dreyer also stated that he underwent an external review of some kind but that no material findings were disclosed to him. Dr. Dreyer subsequently advised MultiCare's Chief Medical Officer, Dr. G.S., that Dr. Dreyer had checked with his own attorney to verify the accuracy of these statements.

146.   Dr. Dreyer's representations to MultiCare at the February 26, 2020 meeting were contrary to MultiCare's direct knowledge that Dr. Dreyer had been

suspended from Providence St. Mary due to allegations of medically unnecessary surgeries. MultiCare conducted no follow up with Dr. Dreyer, Dr. Dreyer's attorney, Providence, the Washington State Department of Health Board of Osteopathic Medicine and Surgery, the USAO, or any outside entity to determine the truth or accuracy of Dr. Dreyer's representations.

147.   On March 6, 2020, in follow up to the February 26th meeting, Dr. Dreyer emailed MultiCare's Chief Medical Officer, Dr. G.S., writing in part:

> There was a 'query' by the osteopathic medical board regarding a complaint by [Dr. M.F.] (a neurosurgeon from Richland, WA. . .). . .After I was hired here, but before I actually started, Providence received a complaint about me from him citing 11 patients he had a problem with. The osteopathic medical board sent a letter to Providence and I did not find out about it until after I started here. Providence hired an attorney to help me review the cases and respond to the "query." He assured me that there was no "investigation." In addition to the narratives of my care that I created, he engaged an outside neurosurgeon and neuroradiologist from academic centers in California.

148.   MultiCare conducted no follow up inquiries, with the Washington State Department of Health Board of Osteopathic Medicine and Surgery, or any outside entity or individual (such as Dr. Dreyer's referenced attorney or experts) regarding Dr. Dreyer's partial admission that he was aware of Dr. M.F.'s complaint against him sometime "after [he] started" at MultiCare. In fact, as detailed above, on May 6, 2019, while Dr. Dreyer was proceeding through the MultiCare credentialing process, the Washington State Department of Health Board of Osteopathic Medicine and Surgery notified Dr. Dreyer that it had received a complaint regarding Dr. Dreyer's patient care.

149.   MultiCare did not report the allegations regarding Dr. Dreyer's medically unnecessary surgeries, his admission to an inquiry into his surgeries by the Washington State Department of Health Board of Osteopathic Medicine and Surgery, or the fact that as a result of the allegations MultiCare was prospectively reviewing all of Dr. Dreyer's elective surgeries, to the National Practitioner Data Bank.

### G. Dr. Dreyer was a National Outlier among other Neurosurgeons for Certain Spinal Surgeries that MultiCare Billed to Medicare.

150.    The United States Department of Health and Human Services Office of Inspector General has access to Medicare Part B claims data, including the CPT codes rendered and/or billed and the number of Medicare beneficiaries billed for, and is able to analyze that data by, among other things, comparing it to other providers in the same specialty.

151.    A peer comparison of Dr. Dreyer's Medicare Part B rendering claims data from July 2019 to March 2021—the time he was credentialed at MultiCare and during which time MultiCare was submitting the claims to Medicare Part B for Dr. Dreyer's professional services—shows that Dr. Dreyer was in the 97th percentile in the use of 14 neurosurgery CPT codes[3] in terms of total Medicare payments, out of

---

[3] The 14 neurosurgery CPT codes included in this peer comparison analysis were: 22614 (Fusion Of Additional Segment Of Spine), 22634 (Fusion Of Additional Segment Of Spine With Partial Removal Of Spine Bone And Disc), 22630 (Fusion Of Lower Spine Bone And Partial Removal Of Spine Bone Or Disc Through Back, 1 Disc), 22558 (fusion of lower spine through abdomen with partial removal of disc), 22556 (Fusion Of Middle Spine Bone Through Side Of Chest With Partial Removal Of Disc), 27279 (Fusion Of Pelvic Joint Using Imaging Guidance), 22585 (Fusion Of Spine Bones Through Front Of Body With Partial Removal Of Disc, Each Additional Disc), 22612 (Fusion Of Spine In Lower Back), 22633 (Fusion Of Spine In Lower Back With Partial Removal Of Spine Bone And Disc), 22600 (Fusion Of Spine In Neck By Posterior Approach), 22610 (Fusion Of Spine In Upper Back), 22551 (Fusion Of Upper Spine Bone With Removal Of Disc And Release Of Spinal Cord Or Nerve, 1 Disc), 22552 (Fusion Of Upper Spine Bone With Removal Of Disc And Release Of Spinal Cord Or Nerve, Each Additional

4,143 neurosurgery providers nationwide with a similar practice size. Additionally, that peer comparison shows that Dr. Dreyer was also in the 97th percentile for the number of Medicare beneficiaries Dr. Dreyer performed those procedures on.

152.   That same peer comparison shows that in 2020--ten months of which MultiCare was supposedly providing concurrent review and surgical oversight by MultiCare's Medical Director of Surgical Services, Dr. J.D.— Dr. Dreyer's use of those same 14 neurosurgery CPT codes for certain of Dr. Dreyer's surgeries was in the 98th percentile nationwide, out of 3,970 neurosurgery providers with a similar practice size, in terms of Medicare payments. Additionally, the data shows that Dr. Dreyer was in the 97th percentile for neurosurgery providers nationwide for the number of Medicare beneficiaries he performed those 14 neurosurgery CPT codes on.

153.   A peer comparison of Medicare Part B data—during the time period that Dr. Dreyer performed surgeries for MultiCare— showed that MultiCare's use of CPT code 22558 (fusion of lower spine through abdomen with partial removal of disc) for certain of Dr. Dreyer's surgeries was in the 99th percentile nationwide in terms of Medicare payments, with the 19th highest amount paid in the nation out of 4,143 neurosurgeons nationwide with a similar practice size. The data also shows that Dr. Dreyer was in the 99th percentile nationwide for the number of Medicare beneficiaries Dr. Dreyer performed that procedure on, with the 14th highest number of beneficiaries out of 4,143 neurosurgeons nationwide.

154.   That same peer comparison of Medicare data also shows that during 2020—ten months of which MultiCare was supposedly providing concurrent review and surgical oversight by MultiCare's Medical Director of Surgical Services, Dr. J.D.—Dr. Dreyer's use of CPT code 22558 (fusion of lower spine through abdomen with partial removal of disc) for certain of Dr. Dreyer's procedures was in the 99th

Disc), and 22554 (Fusion Of Upper Spine Bones Through Front Of Neck With Partial Removal Of Disc).

United States' and State of Washington's Complaint in Intervention - 50

percentile nationwide for the total amount paid by Medicare, and Dr. Dreyer was in the 99th percentile for the total number of Medicare beneficiaries he performed that procedure on.

155.   The below table provides a summary of Medicare Part B data comparing MultiCare's use of specific spinal surgery CPT codes for certain of Dr. Dreyer's surgeries, in terms of Medicare payments and the number of Medicare beneficiaries Dr. Dreyer performed those specific procedures on, to other neurosurgery providers nationwide with a similar practice size:

| CPT Code | CPT Code Description | Medicare Paid Amount Percentile 7/2019–3/2021[4] | Medicare Paid Amount Percentile 2020[5] | Number of Medicare Beneficiaries Percentile 7/2019-3/2021[6] | Number of Medicare Beneficiaries Percentile 2020[7] |
|---|---|---|---|---|---|
| 22853 | insertion of cage or mesh device to spine bone and disc space during spine fusion | 98th percentile nationwide | 99th percentile nationwide | 98th percentile nationwide | 99th percentile nationwide |
| 22846 | placement of stabilizing device to front, 4-7 spine bone segments | 97th percentile nationwide | 99th percentile nationwide | 97th percentile nationwide | 99th percentile nationwide |
| 63047 | Partial removal of spine bone with release of lower spinal cord | 97th percentile nationwide | 96th percentile nationwide | 98th percentile nationwide | 98th percentile nationwide |

[4] Out of 4,143 neurosurgery providers nationwide.
[5] Out of 3,970 neurosurgery providers nationwide.
[6] Out of 4,143 neurosurgery providers nationwide.
[7] Out of 3,970 neurosurgery providers nationwide.

| CPT Code | CPT Code Description | Medicare Paid Amount Percentile 7/2019–3/2021 | Medicare Paid Amount Percentile 2020 | Number of Medicare Beneficiaries Percentile 7/2019-3/2021 | Number of Medicare Beneficiaries Percentile 2020 |
|---|---|---|---|---|---|
| | and/or nerves, 1 segment | | | | |
| 22845 | placement of stabilizing device to front, 203 spine bone segments | 97th percentile nationwide | 98th percentile nationwide | 98th percentile nationwide | 99th percentile nationwide |
| 22585 | fusion of spine bones through front of body with partial removal of disc, each additional disc | 98th percentile nationwide | 99th percentile nationwide | 98th percentile nationwide | 99th percentile nationwide |

156.   During the time Dr. Dreyer was credentialed at MultiCare, Dr. Dreyer was a national outlier compared to other neurosurgery providers with a similar practice size, in terms of the amounts Medicare Part B paid for some of the neurosurgery procedures detailed above and for the number of Medicare beneficiaries he performed those procedures on. Additionally, Dr. Dreyer was also a national outlier for some of the above detailed neurosurgery procedures during the time period when MultiCare was supposedly providing concurrent review and surgical oversight by MultiCare's Medical Director of Surgical Services, Dr. J.D., of all of Dr. Dreyer's planned surgical cases.

//

//

//

United States' and State of Washington's Complaint in Intervention - 52

**H. Dr. Dreyer Resolved His False Claims Act Liability For the Surgeries he Performed While at MultiCare and Admitted that MultiCare Incentivized More Complex Spinal Surgeries and Billed Federal Health Care Programs for his Work.**

157.   On April 14, 2023, Dr. Dreyer resolved the allegations by the United States and the State of Washington that he had violated the Federal False Claims Act and the Washington State False Claims Act while conducting surgeries for MultiCare, by paying a total settlement amount to the United States and the State of Washington of $1,174,849, of which $587,424 was restitution for the false and fraudulent claims for Dr. Dreyer's surgeries paid to MultiCare by federal health care programs.

158.   As part of that resolution, Dr. Dreyer admitted that while he was employed at MultiCare as a neurosurgeon MultiCare submitted claims to and accepted reimbursement from federal health care programs including Medicare, Medicaid, TRICARE, VA Community Care, and FEHBP, for neurosurgery and other services performed by Dr. Dreyer.

159.   As part of that resolution, Dr. Dreyer admitted that during the time he was employed at MultiCare, MultiCare paid Dr. Dreyer compensation based on wRVUs with no cap on the wRVU-based compensation that could be earned meaning that, generally, the greater the number procedures of higher complexity he performed for MultiCare the greater his compensation.  Dr. Dreyer admitted that based on his wRVU-based compensation, in 2021 MultiCare paid him over $1.7 million.

160.   As part of that resolution, Dr. Dreyer admitted that on March 12, 2021, as a result of allegations against him the Washington State Department of Health Board of Osteopathic Medicine and Surgery issued an immediate suspension of his ability to perform spinal surgeries and on November 18, 2021, he resigned from MultiCare.

161.   As part of that resolution, Dr. Dreyer agreed to be excluded from Medicare, Medicaid, and all other federal health care programs for nine (9) years.  The

nine (9) year exclusion has national effect and prevents federal health care programs from paying anyone for items or services furnished, ordered, or prescribed by Dr. Dreyer in any capacity during the exclusion period regardless of who submits the claim for payment. This payment prohibition applies to Dr. Dreyer and all other individuals and entities (including, for example, anyone who employs or contracts with Dr. Dreyer, and any hospital or other provider where Dr. Dreyer provides services). Violation of the conditions of the exclusion may result in criminal prosecution. Reinstatement of Dr. Dreyer is not automatic even after the nine (9) year exclusionary period.

## I. False and Fraudulent Claims Submitted by MultiCare

162. MultiCare submitted and caused to be submitted claims to federal health care programs for at least $8,411,579 for Dr. Dreyer's professional services rendered between July 2019 and March 2021 and the additional medical costs related to those professional services. The total amount for which MultiCare submitted and caused to be submitted claims and which were paid by federal health care programs included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare for and related to Dr. Dreyer's surgeries on federal health care beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

### i. Medicare Part A

163. MultiCare submitted, and caused to be submitted, claims for and was paid by Medicare Part A, through the MAC, at least $3,949,851 for claims, where Dr. Dreyer was the attending and/or operating provider for inpatient and outpatient care, between July 2019 and March 2021, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to Medicare Part A, through the MAC, for and related to Dr. Dreyer's surgeries on Medicare beneficiaries that were based on falsified diagnoses, were medically unnecessary,

were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.  MultiCare's materially false and fraudulent claims for payment that it knowingly submitted and caused to be submitted to Medicare Part A, through the MAC, included false and fraudulent CMS 1450 claim forms and cost reports.

## ii. <u>Medicare Part B</u>

164.    MultiCare submitted, and caused to be submitted, claims for and was paid by Medicare Part B, through the MAC, at least $460,016 for Dr. Dreyer's professional services rendered between July 2019 and March 2021, which included materially false and fraudulent claims, including CMS 1500 claim forms, knowingly submitted, and caused to be submitted, by MultiCare to Medicare Part B, through the MAC, for and related to Dr. Dreyer's surgeries on Medicare beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

## iii. <u>Medicare Part C</u>

165.    According to information reported by the MA plans to CMS, MultiCare submitted, and caused to be submitted, claims for and was paid by Medicare Part C, through the MA plans, at least $2,407,064 for Dr. Dreyer's operating claims between July 2019 and March 2021, and the additional medical costs related to those professional services, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to Medicare Part C, through the MA plans, for and related to Dr. Dreyer's surgeries on Medicare beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

//

//

United States' and State of Washington's Complaint in Intervention - 55

#### iv.  Medicaid

166.  MultiCare submitted, and caused to be submitted, at least 1,881 claims for Dr. Dreyer's professional services rendered between July 2019 and March 2021, and the additional medical costs related to those professional services to Medicaid. Medicaid paid at least $889,381 to MultiCare based on those claims, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to Medicaid for and related to Dr. Dreyer's surgeries on Medicaid beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

#### v.  TRICARE

167.  MultiCare submitted, and caused to be submitted, claims for and was paid by the TRICARE Plan contracted with DoD to administer TRICARE, at least $31,811 for Dr. Dreyer's professional services rendered between July 2019 and March 2021, and the additional medical costs related to those professional services, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to the TRICARE Plan contracted with DoD to administer TRICARE for and related to Dr. Dreyer's surgeries on TRICARE beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

#### vi.  VA

168.  MultiCare submitted, and caused to be submitted, claims for and was paid by the VA, through VHA, at least $644,144 for Dr. Dreyer's professional services rendered between July 2019 and March 2021, and the additional medical costs related to those professional services, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to the VA, through VHA, for and related to Dr. Dreyer's surgeries on VA Community Care beneficiaries

that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

### vii.  OPM

169.  MultiCare submitted, and caused to be submitted claims for and was paid by OPM, through various FEHB Plans, at least $29,312 for Dr. Dreyer's professional services rendered between July 2019 and March 2021, and the additional medical costs related to those professional services, which included materially false and fraudulent claims knowingly submitted, and caused to be submitted, by MultiCare to OPM, through various FEHB Plans, for and related to Dr. Dreyer's surgeries on FEHB Plan beneficiaries that were based on falsified diagnoses, were medically unnecessary, were not medically indicated, were performed below the applicable standard of care, and/or were not actually performed.

### J.  Examples of Fraudulent Billing

170.  MultiCare submitted materially false and fraudulent claims for Dr. Dreyer's professional services to federal health care programs, from July 2019 through at least March of 2021, billing for procedures not performed, billing for procedures based on false and fraudulent diagnoses, billing for medically unnecessary procedures, and billing for procedures performed below the applicable standard of care.  During that same time MultiCare also submitted materially false and fraudulent claims to federal health care programs for medical services, supplies, other medical providers' professional services, and other costs related to or necessitated by the falsely and fraudulently claimed professional services of Dr. Dreyer.

171.  The below are examples of MultiCare's materially false and fraudulent claims to federal healthcare programs for Dr. Dreyer's professional services and related medical costs.

//

//

United States' and State of Washington's Complaint in Intervention - 57

i.  Medicare/TRICARE/VA Beneficiary- Patient M.W.

172.  At all relevant times, Patient M.W. was a Medicare beneficiary and was also insured by TRICARE as well as by the VA through Triwest Choice.  When first seen by MultiCare neurosurgery in February 2019, Patient M.W. was a 68 year old veteran who presented with, among other conditions, obesity, diabetes, PTSD, and chronic back pain.

173.  Patient M.W. received three spinal surgeries at MultiCare between February 2019 and February 2020.  The first spinal surgery at MultiCare was performed on February 4, 2019, prior to MultiCare hiring and credentialing Dr. Dreyer.  MultiCare's pre-operative diagnosis of Patient M.W. at that time was intractable back pain and lumbar radiculopathy.

174.  The February 4, 2019, surgery on Patient M.W. resulted, among other things, in the insertion of a left interbody fusion cage at L5-S1.  In the months that followed Patient M.W. was admitted to the emergency room multiple times.  Patient M.W.'s cage failed in the months following the initial MultiCare surgery necessitating a removal and replacement surgery.

175.  On or about his first day as a credentialed neurosurgeon at MultiCare, July 23, 2019, Dr. Dreyer saw and assessed Patient M.W. and determined, among other things, that there had been posterior displacement of the left interbody fusion cage located at L5-S1, and planned surgery for Patient M.W. for, among other things, hardware removal and replacement on the left from L3-S1 and posterolateral fusion on the right L3-S1.

176.  On August 28, 2019, Dr. Dreyer conducted the second MultiCare surgery on Patient M.W. Dr. Dreyer's MultiCare surgery on Patient M.W. was medically necessary for the removal of the failed interbody fusion cage at L5-S1 from the first MultiCare surgery.  In addition to the medically necessary removal of the failed interbody fusion cage and re-insertion of a new interbody fusion cage, Dr. Dreyer also claimed to perform a laminectomy for decompression to address ostensible severe

United States' and State of Washington's Complaint in Intervention - 58

spinal stenosis at L2-L3.  Dr. Dreyer's operation notes for his August 28, 2019, surgery on Patient M.W. state that "[u]sing high-speed electric drilling, the lamina of L2 and L3 were removed."

177.   Nearly six months later, on February 24, 2020, more than a week after the USAO provided an explicit written notice to MultiCare, with detailed associated materials, regarding the fact that Dr. Dreyer was under federal investigation and the potential danger that Dr. Dreyer posed to patient safety based on, among other things, his fraudulent billing supported by falsified diagnoses, Dr. Dreyer conducted a medically unnecessary surgery at MultiCare on Patient M.W.  Specifically, among the multiple procedures performed on Patient M.W. by Dr. Dreyer that day, Dr. Dreyer removed screws from L3-S1 from the previously installed hardware and replaced them all with new screws up to L2, all of which was medically unnecessary and substantially increased the costs.

178.   In addition, despite having noted that he had removed the lamina of L2 and L3 during his previous surgery on Patient M.W., Dr. Dreyer again claimed, this time in his February 24, 2020, operation notes that "[u]sing high-speed electric drilling, the lamina of L2 and L3 were removed."  This procedure was either not actually performed or, if performed, was medically unnecessary.

179.   MultiCare knowingly submitted false and fraudulent claims to Medicare, including false and fraudulent CMS 1500 forms, billing Medicare Part B a total of $23,613 for Dr. Dreyer's professional services for the February 24, 2020, surgery on Patient M.W.  MultiCare's false and fraudulent claims for that surgery included the medically unnecessary procedures that Dr. Dreyer performed and which were claimed under CPT codes 22830, 22842, 22612, 22614, 61783, and 20930, which Medicare would not have paid for had it known the procedures were medically unnecessary, and performed below the appropriate standard of care, contrary to the certifications on the corresponding CMS 1500 claim forms falsely and fraudulently claiming that those procedures were medically indicated, were medically necessary for Patient M.W., and

were performed with the appropriate standard of care. MultiCare's false and fraudulent CMS 1500 claim forms that it submitted and caused to be submitted to Medicare also included billing Medicare under CPT code 63047 for the laminectomy at L2 and L3 that either was not performed or was not medically indicated and was not medically necessary.

180.    MultiCare also submitted false claims to Medicare by billing Medicare, including through CMS 1450 claim forms and/or cost reports, over $200,000 for the medical costs related to Dr. Dreyer's February 24, 2020, surgery on Patient M.W., which included medical supplies and surgical implants that were medically unnecessary and which Medicare would not have paid for had it known the medical supplies and surgical implants were for procedures that were medically unnecessary.

ii.    Medicare Beneficiary- Patient I.L.

181.    At all relevant times, Patient I.L. was a Part C Medicare beneficiary through Humana.

182.    Dr. Dreyer operated on Patient I.L. four times between 2015 and 2020. The first three surgeries were performed by Dr. Dreyer at Providence St. Mary.

183.    Dr. Dryer's first surgery on Patient I.L. was conducted on January 6, 2015, at Providence St. Mary and included a medically unnecessary four-level spinal fusion.

184.    On or about October 28, 2020, after MultiCare had received the explicit written notification that Dr. Dreyer was under federal investigation for, among other things, falsifying diagnoses and conducting medically unnecessary surgeries, and while MultiCare was supposedly providing concurrent review and surgical oversight by MultiCare's Medical Director of Surgical Services, Dr. J.D., of all of Dr. Dreyer's planned surgical cases, Dr. Dreyer conducted his fourth surgery on Patient I.L., which included another medically unnecessary spinal fusion at C4-5 that was performed below the appropriate standard of care.

185.   MultiCare submitted and caused to be submitted claims for payment, and was paid by Medicare Part C, through Humana, a total of $27,047.16 for Dr. Dreyer's October 28, 2020, surgery on Patient I.L., which included false and fraudulent claims for the unnecessary spinal fusion at C4-5 under CPT code 22554, which was performed below the appropriate standard of care.

186.   Had Humana as a federal contractor for Medicare, or CMS on behalf of Medicare, known that MultiCare's Medicare Part C claims for payment of and associated with Dr. Dreyer's October 28, 2020, surgery on Patient I.L., totaling $27,047.16, included costs for the medically unnecessary spinal fusion at C4-5, including the claim under CPT code 22554, neither Humana nor CMS would have authorized the payment to MultiCare for the medically unnecessary spinal fusion performed below the appropriate standard of care.

### iii.   Medicare Patient D.P.

187.   At all relevant times, Patient D.P. was a Part C Medicare beneficiary through Humana.

188.   When first seen by MultiCare neurosurgery in June 2020, Patient D.P. was a 64 year old female who presented with comorbidities including asthma, depression, chronic pain syndrome, anxiety disorder, stage 3 chronic kidney disease, PTSD, fibromyalgia, osteoarthritis, pain disorder with related psychological factors, post-concussion syndrome, syncope.

189.   After MultiCare had received the explicit written notification that Dr. Dreyer was under federal investigation for, among other things, falsifying diagnoses and conducting medically unnecessary surgeries, and while MultiCare was supposedly providing concurrent review and surgical oversight by MultiCare's Medical Director of Surgical Services, Dr. J.D., of all of Dr. Dreyer's planned surgical cases, Dr. Dreyer performed spinal surgery on Patient D.P. at MultiCare Deaconess Hospital on September 16, 2020.

United States' and State of Washington's Complaint in Intervention - 61

190.   On August 30, 2020, Patient D.P. had a cervical spine MRI. The MRI was read with a comparator of her May 5, 2016, CT Scan. With the exception of further degenerative changes at C2-C3, the Radiologist read the MRI indicating "no change" from the 2016 imaging. There was no indication of any loss, or marked restriction of cerebrospinal fluid, or instability in the cervical spine.

191.   The standard of care for Patient D.P. would have called for a conservative 1 or 2-level fusion as a starting point. Instead, Dr. Dreyer performed a medically unnecessary anterior and posterior reconstruction on Patient D.P. on September 16, 2020.

192.   MultiCare submitted and caused to be submitted claims for payment, and was paid by Medicare Part C, through Humana, a total of at least $13,138.95 for Dr. Dreyer's services associated with his September 16, 2020, surgery on Patient D.P., which included false and fraudulent claims for the unnecessary anterior and posterior reconstruction, performed below the appropriate standard of care, including claims under CPT codes 22846 and 22843.

193.   Had Humana, as a federal contractor for Medicare, or CMS on behalf of Medicare, known that MultiCare's Medicare Part C claims for Dr. Dreyer's services for the September 16, 2020, surgery on Patient D.P. included false and fraudulent claims for the medically unnecessary anterior and posterior reconstruction which was performed below the appropriate standard of care, Humana would not have authorized payment to MultiCare for the medically unnecessary procedure.

iv. <u>Medicaid/Medicare Beneficiary- Patient T.K.</u>

194.   Patient T.K. was a dual-eligible Medicaid and Medicare beneficiary who came to the Deaconess Hospital North Emergency Department on July 31, 2020 complaining of neck and back pain.

195.   Patient T.K. was 40 years old at the time, had a previous spinal fusion 13 years before, and reported weakness in his extremities after lifting a couch into a vehicle.

United States' and State of Washington's Complaint in Intervention - 62

196.   On July 31, 2020, Patient T.K. underwent a CT scan and on August 1, 2020, underwent an MRI.   The radiologist report from those imaging studies concluded that Patient T.K. had moderate and mild stenosis at the C5-6 and C6-7 vertebrae. Patient T.K. did, however, have a large, ruptured disc at the C3-4 vertebrae compressing his spinal cord, with symptoms consistent with spinal cord injury present on examination and on MRI imaging. The latter legitimately required urgent surgery.

197.   However, Patient T.K. was a poor surgical candidate for any non-urgent surgery because he smoked. Smoking increases the risk of non-union after spinal fusion. Non-union is the failure of the fragments of a fractured bone to heal or obtain bony fusion. Non-union places more strain on the screws, which are then more likely to break. T.K.'s smoking habit was a strong predictor of a failed outcome.

198.   On August 2, 2020, Dr. Dreyer falsely diagnosed T.K. with severe stenosis at C5-6 and C6-7, a finding that was unsupported by the independent radiology reads characterizing the stenosis of those vertebrae as moderate or mild.

199.   On August 3, 2020, Dr. Dreyer performed the urgent surgery on C3-4 and, relying on his exaggerated and false diagnosis, proceeded to operate on C5-6 and C6-7, a much more invasive surgery that increased the risk of complications. Increasing the number of levels of surgery from C3-4 to C3 to C7 increased the risk of non-union. These surgeries could have been delayed to allow Patient T.K. to heal from the C3-4 spinal procedure and to allow bone metabolism to optimize, improving the chances that the multi-level fusion would succeed. It would also have given Patient T.K.'s care team time to encourage smoking cessation, which would also have increased the chances of a successful medical outcome.

200.   There was no clinically urgent need to conduct these aggressive additional procedures involving C5-7. They were not reasonably medically necessary. The screws in Patient T.K.'s back eventually broke, and T.K. was scheduled for a procedure with another doctor to repair the screws. Patient T.K. was so distressed by the medical care he received that the doctor who was going to attempt to repair those

screws cancelled the procedure on the day it was scheduled, July 28, 2021, due to T.K.'s extreme anxiety about being operated on again.

201.    These procedures matched Dr. Dreyer's pattern of misconduct from Providence St. Mary and went beyond merely bad medicine. Performing all of these procedures on an urgent basis, based on a falsified and exaggerated diagnosis, allowed him to accumulate more wRVUs and increase his compensation, at the expense of the patient's safety and well-being.  Moreover, the falsified and exaggerated diagnosis caused Medicare to pay for a procedure that was not reimbursable and for which it should not have paid.

202.    On or about August 10, 2020, MultiCare knowingly submitted false and fraudulent claims to Medicare Part A totaling $128,613.60, through a CMS 1450 claim form or its electronic equivalent, for inpatient services provided to Patient T.K associated with Dreyer's surgical procedures. On or about August 24, 2020, MultiCare knowingly submitted false and fraudulent claims for these procedures to Medicaid as well.  Medicaid did not ultimately pay MultiCare's August 24, 2020, false and fraudulent claims for Dr. Dreyer's August 3, 2020, surgery on Patient T.K., because Medicare Part A paid a higher amount for those claims.

203.    MultiCare knowingly submitted, and caused to be submitted, inpatient Medicare Part A claims and Medicaid claims related to Dr. Dreyer's August 3, 2020, surgical procedures on Patient T.K., and other associated medical costs, which were materially false and fraudulent because they were based in part on an exaggerated and false diagnosis of severe stenosis and were, in part, not medically necessary and were not medically necessary on an urgent basis and were performed below the applicable standard of care.  On or about August 24, 2020, Medicare Part A paid MultiCare $20,181.10 for these false and fraudulent inpatient claims, some or all of which would not have been paid by Medicare had Medicare known that the claims were false and fraudulent.

United States' and State of Washington's Complaint in Intervention - 64

204.   The above are simply examples of MultiCare's knowing submission of false and fraudulent claims for procedures performed by Dr. Dreyer based on falsified and exaggerated diagnoses, medically unnecessary procedures, procedures performed below the appropriate standard of care, and falsely billed procedures that were not performed.   Based on review of Dr. Dreyer's surgical practices, a very substantial proportion of the procedures and services for which MultiCare submitted claims to federal health care programs for Dr. Dreyer's services and procedures, and the ensuing claims submitted by MultiCare for those services and procedures, were false and fraudulent in that they involved falsified and exaggerated diagnoses, falsely billed for procedures that were not actually performed, and/or knowingly submitted a claim for a medically unnecessary procedure or a procedure involving an inappropriate surgical candidate or performed below the appropriate standard of care.

### COUNT I
### (Violation of False Claims Act)
### (31 U.S.C. § 3729(a)(1)(A))

205.   The United States incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.   Defendant violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and causing to be presented to Medicare Part A, Medicare Part B, Medicare Part C, Medicaid, TRICARE, the VA, and OPM, materially false and fraudulent claims for payment for the professional services of Dr. Jason Dreyer D.O., and related medical costs, for surgical procedures he performed on federal health care beneficiaries.

207.   The United States paid the false and fraudulent claims because of Defendant's acts, and incurred damages as a result.

208.   Pursuant to 31 U.S.C. § 3729(a), Defendant is liable to the United States Government for a civil penalty for each violation of the False Claims Act committed by Defendant.

United States' and State of Washington's Complaint in Intervention - 65

Pursuant to 31 U.S.C. § 3729(a), Defendant is liable to the United States for three times the amounts of all damages sustained by the United States because of Defendant's conduct.

## COUNT II
### Violation of the False Claims Act
### (31. U.S.C. § 3729(a)(1)(B))

209.    The United States incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

210.    Defendant violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims for payment, described *supra* at paragraphs 162-203, to Medicare Part A, Medicare Part B, Medicare Part C, Medicaid, TRICARE, the VA, and OPM, for the professional services of Dr. Jason Dreyer D.O., and related medical costs, for surgical procedures he performed on federal health care beneficiaries, and which claims the United States did pay.

211.    The United States paid the false and/or fraudulent claims because of Defendant's acts, and incurred damages as a result.

212.    Pursuant to 31 U.S.C. § 3729(a), Defendant is liable to the United States Government for a civil penalty for each violation of the False Claims Act committed by Defendant.

213.    Pursuant to 31 U.S.C. § 3929(a), Defendant is liable to the United States for three times the amounts of all damages sustained by the United States because of Defendant's conduct.

## COUNT III
### Violation of the Washington State False Claims Act
### (RCW 74.66.020(1)(a)-(b))

214.    The State of Washington incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

215.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims between July 23, 2019 through March 12, 2021. Specifically, Defendant submitted false claims for payment contrary to the Washington State Medicaid Fraud False Claims Act. The State sustained damages because of this conduct by the Defendants.

## COUNT IV
### (Payment by Mistake)

216.    The United States incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

217.    This is a claim for the recovery of monies paid by the United States to Defendant as a result of mistaken understandings of fact based on the false and fraudulent claims for payment for medical services rendered by Dr. Jason Dreyer D.O. submitted by Defendant to federal health care programs including to the United States Centers for Medicare and Medicare Services (CMS) Medicare and Medicaid programs, the United States Department of Veterans Affairs' Community Care program, the United States Department of Defense's (DoD) TRICARE program, and the United States Office of Personnel Management's (OPM) Federal Health Benefits program.

## COUNT V
### (Unjust Enrichment)

218.    The United States incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

219.    This is a claim for the recovery of monies by which Defendant has been unjustly enriched at the expense of the United States.

220.    By directly or indirectly obtaining government funds to which it were not entitled, Defendant was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

United States' and State of Washington's Complaint in Intervention - 67

## COUNT VI
### (Negligence)

221.   The United States incorporates by reference Paragraphs 1 through 204 of this Complaint as if fully set forth herein.

222.   This is a claim for the recovery of damages to the United States Centers for Medicare and Medicare Services (CMS) Medicare and Medicaid programs, the United States Department of Veterans Affairs' Community Care program, the United States Department of Defense's (DoD) TRICARE program, and the United States Office of Personnel Management's (OPM) Federal Health Benefits program, caused by Defendants' negligence.

223.   Defendant, owing a duty of care to the United States as  a licensed provider under the Medicare program and which promised to use due care in submitting and causing the submission of claims to Medicare and all federal health care programs, negligently breached that duty, causing damages to the United States in the form and amount of payments made by the United States Centers for Medicare and Medicare Services (CMS) Medicare and Medicaid programs, the United States Department of Veterans Affairs' Community Care program, the United States Department of Defense's (DoD) TRICARE program, and the United States Office of Personnel Management's (OPM) Federal Health Benefits program, upon claims based on requests for neurosurgeries and other medical services performed by Dr. Jason Dreyer D.O. made by Defendant.  Defendant is liable to the United States for those damages.

## COUNT VII
### (Unjust Enrichment)

224.   Co-Plaintiff Washington State repeats and re-alleges each allegation in paragraphs 1 through 204 as though fully set forth herein.

225.   From July 2019 through March 2021, Defendants knowingly obtained Medicaid reimbursement payments from the State that they were not entitled to receive.

United States' and State of Washington's Complaint in Intervention - 68

226.    Defendant continues to retain those improper payments despite knowing that payments were based on material misrepresentations. Defendant knew or appreciated that the State would not have paid for those of Dr. Dreyer's procedures that were based on falsified or exaggerated diagnoses had the State known of these misrepresentations. Because Medicaid already has insufficient funding to meet client needs, fraud such as that committed by Defendant results in fewer benefits available to care for needy clients. Under the circumstances, it would be inequitable to allow Defendant to retain the value of the Medicaid overpayments.

227.    Defendant is liable to Co-Plaintiff Washington State for the full value of the Medicaid overpayments attributable to Defendant's misrepresentations.

## COUNT VIII
### (Conversion)

228.    Co-Plaintiff Washington State repeats and re-alleges each allegation in paragraphs 1 through 204 as though fully set forth herein.

229.    Defendant willfully and wrongfully deprived Co-Plaintiff Washington State of the possession of Medicaid funds through the actions described above. Defendant had no legal right to possess the funds and have failed to return the funds to the Co-Plaintiff.  The Co-Plaintiff has been damaged by Defendant's conduct.

## PRAYER FOR RELIEF

WHEREFORE, the United States and the State of Washington demand and pray that judgment be entered in its favor against Defendant as follows:

I.    On the First and Second Counts, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.    On the Third Count, under the Washington State False Claims Act, for the amount of Washington State's damages, trebled as required by law, and such civil

United States' and State of Washington's Complaint in Intervention - 69

penalties as are authorized by law, together with all such further relief as may be just and proper.

III.    On the Fourth, Fifth, and Sixth Counts, for payment by mistake, unjust enrichment, and negligence, respectively, for the damages sustained and/or amounts by which Defendant was unjustly enriched or was paid by mistake, and for the damages caused to the United States as a result of Defendant's negligence, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

IV.    On the Seventh and Eighth Counts, for unjust enrichment and conversion for the damages sustained by Washington State and amounts by which Defendant was unjustly enriched as to Washington State, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

The United States and the State of Washington demand a trial by jury in this case.

DATED this 26th day of January, 2024,

Vanessa R. Waldref
United States Attorney

By: _____
Tyler H.L. Tornabene
Assistant United States Attorney
United States Attorney's Office
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767
Email: Tyler.H.L.Tornabene@usdoj.gov
*Counsel for Plaintiff United States of America*

By: _____
Dan Fruchter

United States' and State of Washington's Complaint in Intervention - 70

Assistant United States Attorney
United States Attorney's Office
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767
Email: DFruchter@usdoj.gov
*Counsel for Plaintiff United States of America*


ROBERT W. FERGUSON
Attorney General


James Douglas Boling, WSBA #47081
Assistant Attorney General
Medicaid Fraud Control Division
PO Box 40114
Olympia, WA 98502
Telephone: 360-586-8888
Facsimile:  360-586-8877
Email: Doug.Boling@atg.wa.gov
*Counsel for Plaintiff State of Washington*

1

## CERTIFICATE OF SERVICE

2

3     I HEREBY CERTIFY that on January 26, 2024, a true and correct copy of the

4     foregoing *United States' and State of Washington's Complaint in Intervention* was

5     emailed to the Relators as follows:

6

GILBERT LAW FIRM, PS

7     **William A. Gilbert**              **Via Email:** bill@wagilbert.com
      421 W. Riverside, Ste 353

8     Spokane, WA 99201

9

10

11

12     _____
       Tyler H.L. Tornabene

13     Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28